**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| XIAOLIANG MOU, |
| |
|       Plaintiff, |
| |
|    v. |
| |
| BTC KING TECHNOLOGY CO., LTD. (d/b/a "BKEX"), and JI JIAMING, |
| |
|       Defendants. |

Case Number 1:26-cv-1311

**<u>JURY TRIAL DEMANDED</u>**

**<u>COMPLAINT</u>**

## INTRODUCTION

1.      This case arises from the collapse of BKEX, a global centralized exchange that induced customers to deposit tens of millions of dollars' worth of cryptocurrency onto its platform by portraying itself as a large, liquid, and credible exchange, while operating a fundamentally deceptive custody model that diverted customer assets off-platform, concealed those transfers, and then froze withdrawals after substantial assets had already been moved beyond reach.

2.      Plaintiff Xiaoliang Mou deposited approximately 115.93 Bitcoin ("BTC"), 14.908 Ethereum ("ETH"), and $53,640 in USD-denominated stablecoins into BKEX-designated deposit addresses. Plaintiff deposited his assets in reliance on BKEX's core custody representations. Namely, that customer assets were held in BKEX's custody, reflected accurately on BKEX's internal ledgers, and available for withdrawal upon demand.

3.      On May 29, 2023, BKEX suspended customer withdrawals, publicly attributing the freeze to a criminal investigation, while wallets associated with BKEX engaged in large-volume transactions consistent with asset flight and money laundering. Customers, including Plaintiff, were told the suspension was temporary and that BKEX was working to restore operations.

4.      The fraudulent scheme continued after the collapse. Rather than disclose the finality of customer losses, Defendants fostered false hope and failed to correct misleading statements about custody and recoverability.

5.      Defendant Ji Jiaming founded BKEX, held himself out as its Chief Executive Officer, and exercised ultimate authority over BKEX's operations, custody practices, and public representations. On information and belief, Ji Jiaming stole millions of dollars' worth of cryptocurrency in the days before and after the withdrawal freeze. Plaintiff's investigation revealed that Ji Jiaming escaped criminal prosecution and remains a fugitive today with the stolen funds.

6.      Plaintiff brings this action under the Commodity Exchange Act ("CEA"), including its antifraud provisions, because the misconduct alleged here was a deceptive scheme carried out in connection with commodity-linked trading activity on a commodity exchange that required customer deposits as trading capital, margin, collateral, and settlement assets. Defendants' misrepresentations about custody and withdrawal availability were central to inducing deposits and sustaining trading activity that generated fees, liquidity, and operational benefits for BKEX.

7.      The CEA provides a private right of action for market participants who suffer damages caused by manipulative or deceptive devices, and fraudulent behavior by commodity exchanges, in connection with commodity transactions, extending liability to those who aid and abet violations or who control exchanges engaged in wrongdoing. Plaintiff seeks to recover the value of his misappropriated cryptocurrency and obtain relief to hold Defendants accountable.

## PARTIES

8.      Plaintiff Xiaoliang Mou is an individual who deposited cryptocurrency on the BKEX trading platform. Plaintiff deposited approximately 115.93 BTC, 14.908 ETH, and approximately $53,640 in U.S. dollar-denominated stablecoins into BKEX-designated accounts and deposit addresses in connection with trading and related financial activity offered by BKEX.

9.      Plaintiff is a citizen of the People's Republic of China and has resided in Switzerland since 2021. Plaintiff brings this action to recover digital assets misappropriated through Defendants' operation of the BKEX platform and to obtain relief for Defendants' fraudulent, deceptive, and unlawful conduct as alleged herein.

10.     Defendant BKEX is a now-defunct cryptocurrency exchange that, on information and belief, was incorporated in the British Virgin Islands and operated as a centralized digital asset

trading platform that accepted customer deposits, maintained custody of customer cryptocurrency, and offered trading, leveraged, and yield-based financial products.

11.    According to BKEX's own public statements, marketing materials, and online representations, BKEX maintained operations, business development activities, and customer solicitation in multiple jurisdictions, including China, Hong Kong, Singapore, Japan, Korea, and the United States, while holding itself out as a global commodity exchange.

12.    BKEX conducted its business through offshore entities, including Defendant BTC King Technology Co., Ltd., which was founded on May 9, 2018, and is incorporated in the British Virgin Islands (incorporation code 1978707; certificate ID 17E5B2ECD0).

13.    Defendant Ji Jiaming is the founder, principal executive, and controlling person of BKEX and BTC King Technology Co., Ltd. From BKEX's inception, Ji Jiaming publicly held himself out as BKEX's CEO and exercised ultimate authority and control over the exchange's operations, custody practices, wallet infrastructure, public representations, and strategic direction.

14.    Ji Jiaming is a Chinese citizen, born on August 3, 1989, and is the holder of Chinese passport number E35910110. In connection with BKEX and related activities, Ji Jiaming has used multiple names and aliases, including Jiaming Ji, Jingyan Ji, JM, and Lion Ji, in public communications, marketing materials, and business dealings.

## JURISDICTION AND VENUE

15.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the CEA, 7 U.S.C. §§ 1 et seq., including 7 U.S.C. §§ 9(1), 13c, and 25.

16.     This Court has exclusive jurisdiction over Plaintiff's CEA claims pursuant to 7 U.S.C. § 25(c), which provides that "[t]he district courts of the United States shall have exclusive jurisdiction of actions brought under this section."

17.     This Court has personal jurisdiction over Defendants because Defendants purposefully directed conduct toward the United States, and Plaintiff's claims arise out of that conduct.

18.     In the alternative, this Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2) because (i) Plaintiff's claims arise under federal law; (ii) Defendants are not subject to general jurisdiction in any single state; and (iii) Defendants have sufficient contacts with the United States to satisfy the requirements of due process.

19.     This Court also has personal jurisdiction over each Defendant based on their knowing participation in a common scheme that involved overt acts committed in, directed at, and causing foreseeable effects within the United States, rendering the exercise of jurisdiction consistent with traditional notions of fair play and substantial justice.

20.     Defendant BKEX engaged in intentional, repeated, and non-incidental conduct directed at the United States, including but not limited to the following:

a.      Making public representations of U.S. connectivity and legitimacy through marketing materials, platform disclosures, and outward-facing communications;

b.      Registering as a Money Services Business ("MSB") with the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"), and repeatedly invoking that registration in user-facing and promotional contexts to signal U.S. regulatory credibility;

c.      Conducting physical marketing and business-development activities in the United States, including participation in U.S.-based cryptocurrency conferences and outreach by BKEX representatives;

d.      Engaging in public recruitment activity that expressly listed the United States as a permissible or designated work location, reflecting contemplated

or ongoing U.S. operational presence and exceeding passive website accessibility;

e.  Participating in investment and listing activity involving U.S.-domiciled or U.S.-linked blockchain projects;

f.  Referencing U.S.-based operations or a "U.S. operation center" in marketing materials and public announcements;

g.  Maintaining global solicitation channels (including social-media platforms, Telegram groups, and web-based services) accessible to U.S. users without effective or consistently enforced geo-blocking; and

h.  Registering and maintaining BKEX's primary domain through GoDaddy, a U.S.-based domain registrar, thereby availing itself of U.S. commercial infrastructure.

21.  BKEX deliberately leveraged U.S. regulatory and market signals to manufacture legitimacy, extracting reputational and commercial value from U.S. institutions while avoiding substantive U.S. regulatory accountability.

22.  BKEX's operations foreseeably and substantially implicated U.S.-linked financial infrastructure, including:

a.  Acceptance of cryptocurrency deposits and liquidity that originated from U.S.-regulated exchanges;

b.  Operational and custodial linkages to Binance, an exchange with substantial U.S. nexus and U.S.-exposed infrastructure; and

c.  The use and promotion of USD-denominated stablecoins, including USDT and USDC, which implicate U.S.-linked issuers, banking rails, and compliance systems.

23.  Defendants' misconduct was expressly aimed at U.S.-linked markets and predictably caused substantial effects within the United States. Plaintiff's claims arise from this conduct, which was calculated to exploit U.S. credibility while externalizing risk to customers and counterparties, rendering the exercise of jurisdiction independently proper.

24.  Defendant Ji Jiaming exercised control over BKEX's U.S.-directed conduct and knowingly benefited from BKEX's exploitation of U.S. credibility.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(c)(3) because Defendants are foreign defendants who may be sued in any judicial district of the United States.

26.     In the alternative, venue is proper pursuant to 28 U.S.C. § 1391(b)(3) because Defendants are subject to personal jurisdiction in this District and no other district constitutes a clearly more appropriate forum.

27.     Venue in this District is also appropriate because Defendants' conduct foreseeably caused effects in U.S. commodity and digital asset markets, and because this District has a substantial interest in adjudicating claims arising under the CEA involving misuse of U.S.-linked financial infrastructure. No alternative forum offers greater convenience, stronger regulatory interest, or superior access to relevant evidence and witnesses.

## FACTUAL BACKGROUND

28.     BKEX marketed itself as a global cryptocurrency exchange offering custodial trading, leveraged contracts, and yield-based products tied to hundreds of cryptocurrencies, including BTC, ETH, and USD-denominated stablecoins.

29.     Plaintiff deposited substantial cryptocurrency on BKEX in reliance on BKEX's core custody representations: namely, that customer assets would remain under BKEX's custody and would be available for withdrawal upon demand.

30.     BKEX operated a fundamentally deceptive custody model. As blockchain forensics confirm, BKEX sent customer funds out of BKEX-designated deposit wallets and into wallets controlled by Binance, without customer authorization and without disclosure. BKEX continued to display customer balances internally as if the assets remained safely held and available. While this undisclosed asset routing was occurring, Defendants simultaneously engaged in a public

campaign to manufacture legitimacy and induce deposits: inflating trading volume, touting global operational centers, and invoking U.S. credibility markers such as FinCEN MSB registration.

31.    On May 29, 2023, BKEX abruptly suspended customer withdrawals. Even after the withdrawal freeze, Defendants continued to misrepresent that recovery was possible and failed to provide any truthful accounting, thereby concealing the finality of customer losses.

**A.    Ji Jiaming founded BKEX, a global cryptocurrency exchange (2018)**

32.    BKEX was founded in or around 2018 by Defendant Ji Jiaming, a Chinese national who conceived, launched, and controlled the exchange from its inception.

33.    From the outset, Ji Jiaming publicly held himself out as the founder and chief operator of BKEX, including through BKEX's official social media accounts, which identified Ji Jiaming as the company's founder and principal executive.

34.    Under Ji Jiaming's direction, BKEX was structured and marketed as a full-service digital asset trading platform offering a broad suite of custodial, leveraged, and yield-based financial products tied to cryptocurrencies and other virtual commodities, including:

    a.    <u>Centralized Custodial Exchange</u>: BKEX operated as a centralized cryptocurrency exchange that accepted customer deposits, maintained custody of customer digital assets, and exercised control over asset storage, internal accounting, and withdrawals. Customers were required to entrust their cryptocurrency to BKEX to access any trading functionality, making BKEX's representations concerning custody, control, and asset availability central to customers' decisions to deposit and trade on the platform.

    b.    <u>Contract Trading (Futures and Perpetuals)</u>: BKEX offered futures-style cryptocurrency trading products, including both fixed-date contracts and perpetual contracts that did not expire. These products allowed users to speculate on the price movements of cryptocurrencies without owning the underlying assets outright. BKEX prominently marketed the availability of extreme leverage—up to 100×—enabling traders to control large notional positions with comparatively small amounts of posted collateral. Participation in these products required customers to deposit and maintain cryptocurrency on the BKEX platform as margin or collateral, which BKEX controlled.

c.  <u>Spot Trading</u>: BKEX offered spot trading in a wide variety of cryptocurrencies, permitting customers to buy and sell digital assets at market prices. Spot trades were executed through BKEX's internal order-matching systems, and settlement occurred through balances reflected on BKEX's internal ledgers. Customers engaging in spot trading were required to maintain custodial balances on the platform, over which BKEX exercised control.

d.  <u>Margin Trading</u>: BKEX also offered margin trading products that allowed users to borrow cryptocurrency or stablecoins to amplify their trading positions. Under BKEX's margin framework, customers' deposited assets were pledged as collateral, subject to liquidation if market movements caused margin requirements to be breached. BKEX unilaterally controlled borrowing terms, margin thresholds, liquidation triggers, and execution mechanics.

e.  <u>Over-the-Counter (OTC) Trading</u>: BKEX offered OTC trading services that facilitated large-volume transactions between counterparties while requiring customers to deposit and maintain assets under BKEX's custody.

f.  <u>DeFi Token Listings</u>: BKEX curated and listed a wide array of decentralized finance ("DeFi") tokens and other emerging digital assets, promoting these listings to customers as investment opportunities and integrating them into BKEX's custodial trading ecosystem.

g.  <u>Staking and Rewards Programs</u>: BKEX offered staking, yield, and rewards programs that promised returns on deposited cryptocurrency. Participation in these programs required customers to transfer custody of their assets to BKEX, which retained control over asset deployment and payouts.

h.  <u>Cloud Mining Services</u>: BKEX marketed cloud mining services that purported to allow customers to earn cryptocurrency rewards without operating physical mining equipment.

i.  <u>Wealth Management Services</u>: BKEX promoted various "wealth management" and fixed-income-style products that offered yield on deposited digital assets, further blurring the line between trading, lending, and investment services while maintaining centralized custody over customer funds.

j.  <u>Native Token Issuance – BKK</u>: BKEX issued and promoted a native utility token known as BKK, which it marketed as an integral component of the BKEX ecosystem. BKK token holders were promised platform-related benefits, including reduced trading fees, access to promotions, and participation in token offerings. BKK was actively traded on the BKEX platform against multiple cryptocurrencies and was used to incentivize

trading activity, liquidity provision, and customer engagement, further entrenching users within BKEX's custodial environment.

35.     Through this integrated suite of custodial, leveraged, and yield-based products, BKEX functioned as a centralized intermediary exercising comprehensive control over customer assets, trading activity, and risk exposure, all under the direction and control of Defendant Ji Jiaming.

**B.     BKEX publicly misrepresented the size of its exchange (2019–2020)**

36.     Defendants embarked on a coordinated public-facing campaign to portray BKEX as a large, liquid, globally regulated cryptocurrency exchange.

37.     In 2019, BKEX publicly reported that it processed approximately $1.1 billion in daily cryptocurrency trading volume.

38.     These reported volume figures were prominently disseminated through industry data aggregators, including CoinMarketCap, and were repeatedly cited by BKEX and Ji Jiaming as evidence of BKEX's scale, liquidity, and market credibility.

39.     BKEX did not process trading activity anywhere near the volumes it claimed. Instead, on information and belief, BKEX allegedly copied the trade data of Binance, the world's largest cryptocurrency exchange, reproducing Binance's transaction history with a delay of several seconds and falsely presenting that data as BKEX's own trading activity. By mirroring Binance's transaction data, BKEX created the false appearance that billions of dollars' worth of cryptocurrency traded daily on its platform.

40.     On July 2, 2019, *Forbes* published an investigative article entitled *"The Anatomy of a Fake Cryptocurrency Trade,"* which identified BKEX as an exchange whose reported trading history appeared to be a near-identical replica of Binance's trade history, delayed by seconds and passed off as original activity.

"Take a close look at trading activity on BKEX—a cryptocurrency exchange founded in 2018 and registered in the British Virgin Islands—and you'll see something odd.  Compare its transactions side-by-side with those of Binance, one of the largest crypto exchanges in the world, and you'll notice BKEX's trading history is a replica, printing the same numbers delayed by a few seconds.  According to CoinMarketCap, BKEX has $1.1 billion in daily volume, making it the 20th-largest exchange on the planet.  Yet it seems to be simply copying Binance's trade history and passing it off as its own, in perhaps the laziest attempt in history to fool people into thinking it's a lively place to trade digital assets."

41.     These fabricated volume figures were material to market participants because trading volume is widely understood in the cryptocurrency industry as a proxy for liquidity, price integrity, execution quality, and counterparty reliability.

42.     In August 2019, Defendant Ji Jiaming amplified these misrepresentations by publicly claiming that BKEX had achieved ninth place globally among cryptocurrency exchanges by trading volume on CoinMarketCap.

43.     At in-person cryptocurrency conferences and industry events, BKEX distributed promotional materials falsely representing that BKEX was a "Top 4 Exchange worldwide."

44.     In addition to inflating trading volume, Defendants falsely represented that BKEX was a licensed and regulated global financial services provider across multiple major jurisdictions.

45.     On information and belief, BKEX falsely claimed in brochures and marketing materials that it had obtained licenses or regulatory approvals to operate in jurisdictions including the United States, Singapore, and Hong Kong, when it had not obtained such authorization.

46.     On information and belief, BKEX also falsely represented in online publications and news articles that it maintained independent trading and operating centers in the United States, Hong Kong, Korea, Japan, and Singapore.

47.    These representations were designed to convey that BKEX was subject to meaningful regulatory oversight, maintained regional operational infrastructure, and complied with jurisdiction-specific financial regulations.

48.    Collectively, Defendants' false and misleading statements regarding trading volume, market ranking, licensing, regulatory status, and global operations constituted a deliberate campaign to manufacture legitimacy, liquidity, and trust in BKEX.

49.    These misrepresentations were material to customers' decisions to deposit cryptocurrency, engage in trading activity, and entrust their assets to BKEX's custody.

50.    Defendants knew, or were reckless in not knowing, that these representations were false or misleading and that customers would rely on them in deciding whether to trade on BKEX.

51.    Defendants' public misrepresentations were not isolated exaggerations but formed an integral component of a broader deceptive scheme that enabled BKEX to attract deposits, sustain trading activity, and conceal its true operational practices.

52.    Defendants' misrepresentations concerning BKEX's scale, liquidity, regulatory standing, and operational integrity directly facilitated the fraudulent conduct that resulted in the misappropriation of Plaintiff's assets.

**C.    Plaintiff deposited his cryptocurrency with BKEX (2020–2022)**

53.    Between 2020 and 2022, Plaintiff deposited substantial quantities of BTC with BKEX for the purpose of engaging in trading activity and financial services offered by BKEX.

54.    In or around October 2020, Plaintiff opened his first BKEX account through the website bkex.com, using the email address "muxiaoliang[AT]gmail.com." After opening this account, Plaintiff transferred a total of approximately 23.431 BTC into a BKEX-designated BTC deposit address, 1Er1F6N29zW5c7KycEwisQxyFDfjBUeeSs, which BKEX controlled.

55.     At the time of these deposits, BKEX represented to Plaintiff that the designated deposit address was a custodial wallet under BKEX's control and that cryptocurrency deposited to that address would be credited to Plaintiff's BKEX account and held for his benefit. Plaintiff reasonably understood and relied on BKEX's representations that his deposited BTC would remain under BKEX's custody and would be available for trading or withdrawal upon request.

56.     In or around December 2021, Plaintiff opened a second BKEX account through bkex.com, using the email address "ericmouxl[AT]gmail.com." Between July 2022 and December 2022, Plaintiff deposited more than 82 BTC into a second BKEX designated BTC deposit address,[1] which BKEX represented was under its custody and control.

57.     Specifically, Plaintiff made the following BTC deposits into the BKEX-designated address during that period:

        a.     On July 21, 2022, Plaintiff deposited 20 BTC.

        b.     On September 21, 2022, Plaintiff deposited 1.04 BTC.

        c.     On September 26, 2022, Plaintiff deposited 4.46 BTC.

        d.     On October 2, 2022, Plaintiff deposited 0.42 BTC.

        e.     On October 20, 2022, Plaintiff deposited 20 BTC.

        f.     On November 7, 2022, Plaintiff deposited 4.19 BTC.

        g.     On November 8, 2022, Plaintiff deposited 20 BTC.

        h.     On November 27, 2022, Plaintiff deposited 2 BTC.

        i.     On December 7, 2022, Plaintiff deposited 5 BTC.

        j.     On December 10, 2022, Plaintiff deposited 5 BTC.

---

[1] 12zfT7HuwoEe6HGX2qPssVJBkUqxdeyE3N

58.    Each of these deposits was initiated by Plaintiff from wallets under his control and transmitted directly to deposit addresses designated by BKEX for the receipt of customer BTC.

59.    Following each deposit, BKEX credited Plaintiff's internal BKEX account with a corresponding BTC balance, reinforcing the representation that Plaintiff's deposited assets were safely held in BKEX's custody and available for use within the platform.

60.    At no point did BKEX disclose to Plaintiff that his deposited BTC would be transferred to, pooled with, or placed under the custody or control of any third-party exchange.

61.    Plaintiff did not authorize BKEX to transfer his BTC to Binance or to any other external platform, nor did Plaintiff consent to any off-platform custody of his assets.

62.    Blockchain forensic analysis confirms that, notwithstanding BKEX's representations, Plaintiff's BTC was transferred out of the BKEX-controlled deposit addresses without Plaintiff's authorization and into multiple cryptocurrency addresses associated with Binance.

63.    The transferred BTC was subsequently consolidated into Binance hot wallet addresses used to process and custody customer assets on Binance's platform.

64.    These transfers occurred without notice to Plaintiff and were not reflected in Plaintiff's BKEX account history or disclosed through any BKEX customer communications.

65.    As a result of these undisclosed transfers, Plaintiff's BTC was removed from BKEX's custody and placed beyond Plaintiff's control while BKEX continued to represent that his assets remained held and available on the platform.

66.    Plaintiff did not discover that his BTC had been transferred to Binance-controlled wallets until after BKEX suspended customer withdrawals and ceased meaningful operations.

67.     Plaintiff's deposits were made in reliance on BKEX's custody representations and were directly connected to the trading activity and financial services BKEX offered.

68.     Blockchain forensic analysis confirms that Plaintiff's BTC was transferred out of the BKEX-controlled deposit address without Plaintiff's authorization and into multiple deposit addresses associated with Binance,[2] and then into Binance's hot wallet address.[3]

**D.     BKEX misappropriated its customers' cryptocurrency (2020–2023)**

69.     BKEX engaged in a systematic practice of misappropriating customer cryptocurrency deposits while representing that those assets remained held under BKEX's custody.

70.     Each time Plaintiff deposited BTC into a BKEX-designated wallet address, BKEX transferred the same quantity of BTC out of that wallet to a wallet identified as belonging to Binance, either on the same day or shortly thereafter.

71.     The outbound transfers matched Plaintiff's deposits in amount and followed each deposit in close temporal sequence, confirming that BKEX was systematically sweeping customer BTC shortly after receipt.

---

[2] Binance Deposit Addresses:

1Hpwn7cec5J9xX1LLLAk7AWVA4eNSJGRsN

1GCEUSPUmMiAdz9UATsYcYXhsNWddMm9ww

1HDWAto9mD4vwZkxE7RZAnxvgYcA5vJQp

1P5q8atTDnH2qkPnWXBAQG8b9E4n4jCHuX

[3] Binance's Hot Wallet Address:

bclqm341sc65zpw79Ixes69zkqmk6ee3ewf0j77s3h

72.     Plaintiff did not initiate, authorize, or approve any of these transfers, nor did Plaintiff provide any instruction permitting BKEX to move his BTC to Binance or any other third-party.

73.     BKEX affirmatively represented that customer assets deposited on the platform would remain under BKEX's custody and be available for withdrawal upon request, and BKEX did not disclose any practice of routing customer funds to another exchange.

74.     The wallets that received Plaintiff's BTC are publicly labeled as Binance deposit or hot wallets, which are used to receive, pool, and process customer assets on Binance's platform.

75.     Control over those wallets, including custody, internal ledgering, transaction authorization, and associated account records, rests exclusively with Binance, not with BKEX.

76.     Plaintiff did not maintain a Binance account corresponding to the transferred BTC and was not provided with access credentials, withdrawal rights, or any means of exercising control over the assets once they were transferred.

77.     Plaintiff did not learn that his cryptocurrency had been transferred to Binance-controlled wallets until after BKEX suspended customer withdrawals and ceased operations.

78.     Following the suspension of withdrawals, BKEX failed to provide any explanation for the disappearance of Plaintiff's cryptocurrency and offered no recovery mechanism, accounting, or remediation.

79.     While misappropriating customer assets, BKEX continued to publicly represent itself as a large, solvent, and globally operating digital asset trading platform.

80.     On September 27, 2021, BKEX published an article on Medium entitled *"BKEX: Based on the global layout, build a reliable digital asset trading platform,"* which portrayed BKEX as a leading global exchange with extensive operations and regulatory credibility.

81.    In that article, BKEX claimed, among other things, that it was "a leading digital asset financial service platform in the world," with "independent trading and operations centers" across Asia, Europe, and the United States.

82.    BKEX further claimed to have "more than 4 million registered users," "an average daily trading volume of US $96 billion," and extensive daily user activity.

83.    The article also emphasized that BKEX "held the MSB financial regulatory license issued by FinCEN," presenting this as proof of regulatory legitimacy and compliance.

84.    BKEX further claimed to rank among the top global exchanges and to offer a comprehensive suite of products, including contract trading, spot trading, OTC trading, cloud mining, and wealth management services.

85.    Throughout 2022, BKEX continued to list new digital assets, including "layer two," DeFi, metaverse, meme, and web3 tokens, promoting these listings as investment opportunities.

86.    In 2022, BKEX advertised "Daily Flexible Mining" offerings on social media, promoting estimated seven-day annualized yields of approximately 9–11 percent.

87.    BKEX also promoted NFT giveaways, "mystery box" promotions, and other incentive programs designed to attract new users and encourage additional deposits.

88.    In 2022, BKEX partnered with crypto venture capital firms and publicly advertised itself as "the world's leading blockchain derivatives service platform," claiming to offer trading in more than 1,200 cryptocurrencies.

89.    BKEX ran promotional "carnivals" and giveaways tied to customer deposits of ETH and other assets, explicitly encouraging customers to transfer additional cryptocurrency onto the platform.

90.    BKEX further expanded into prediction-style betting products, including offerings tied to the 2022 World Cup, requiring customers to deposit assets under BKEX's custody.

91.    During this period, Defendant Ji Jiaming posted publicly in December 2022 that cryptocurrencies would soon be recognized as "financial commodities."

92.    Between December 2022 and February 2023, BKEX repeatedly promoted "Fixed Income" services for deposits of USDT and ETH, encouraging customers to lock up assets in exchange for promised returns.

93.    At the same time, BKEX maintained an English-language Telegram group with approximately 46,000 members, through which it communicated promotional messages, product announcements, and assurances to customers.

94.    These ongoing promotions and representations were made while BKEX was misappropriating customer assets and concealing off-platform transfers.

95.    Defendants' continuing misrepresentations induced customers, including Plaintiff, to believe that BKEX remained solvent, operational, and capable of honoring withdrawal requests.

96.    BKEX's misappropriation of customer assets and contemporaneous promotional activity were mutually reinforcing components of a single fraudulent course of conduct.

97.    Defendants' conduct deprived Plaintiff of his deposited cryptocurrency and stripped him of any opportunity to protect or recover his assets before BKEX ceased operations.

**E.    BKEX suspended customer withdrawals and stole funds (May 29, 2023)**

98.    On May 29, 2023, BKEX announced that it was suspending customer withdrawals, citing an ongoing criminal investigation by Chinese authorities involving certain BKEX personnel.

99.    BKEX did not disclose the scope of the investigation, the identities of the individuals involved, or whether customer assets had been seized, frozen, or otherwise compromised.

100.    At the time of the announcement, BKEX represented to customers that the withdrawal suspension was temporary and that the exchange was working to restore operations.

101.    BKEX further assured customers that it remained committed to transparency and that customer service channels would remain available to address concerns.

102.    These representations were materially misleading because, as set forth below, BKEX and its principals were actively transferring and laundering customer assets immediately before and contemporaneously with the withdrawal freeze.

103.    In the days leading up to the May 29, 2023 withdrawal suspension, wallets operated by Defendants engaged in a rapid and coordinated series of transactions that moved tens of millions of dollars' worth of cryptocurrency out of BKEX-controlled wallets.

104.    These transactions were not consistent with routine customer withdrawals and bore the hallmarks of deliberate asset flight, including high-volume transfers, rapid sequencing, and routing through multiple exchanges and ecosystems.

105.    On May 21, 2023, eight days before BKEX publicly suspended withdrawals, BKEX executed thirty-eight (38) outbound transfers to four cryptocurrency wallets, collectively moving more than $2.28 million worth of TRON (TRX).

106.    Of that amount, approximately $2 million was transferred directly into a wallet publicly identified as a Binance deposit wallet, placing those assets under Binance's custody.

107.    Shortly thereafter, in eight additional transactions, approximately $2.38 million in USDT was transferred out of that wallet and routed into another wallet associated with Binance.

108.    Beyond these initial transfers, blockchain records show that tens of millions of dollars' worth of cryptocurrency were moved through wallets whose ultimate beneficiaries could not be readily identified.

109.    For example, on May 29, 2023, a single wallet address received approximately 60 million USDT, representing roughly $60 million in value.

110.    On that same day, nearly 100 million USDT was transferred from that wallet to a wallet associated with the "Just ecosystem," a decentralized protocol, further obfuscating the trail of funds.

111.    That same wallet address also executed an additional transaction of approximately $50 million, transferring those funds into a deposit wallet associated with Bitfinex, another major cryptocurrency exchange.

112.    The timing, scale, and sequencing of these transactions demonstrate that BKEX and its principals were actively draining and laundering customer assets immediately before and during the withdrawal freeze.

113.    While these asset transfers were occurring, BKEX continued to issue public statements and private communications assuring customers that their assets were secure and that withdrawals would resume.

114.    Customers, including Plaintiff, were told that BKEX was maintaining "transparent and fast communication" and that customer service representatives were available to assist during the suspension.

115.    BKEX did not disclose that customer assets had already been transferred out of BKEX's custody, routed through third-party exchanges, or placed beyond BKEX's control.

116.    BKEX's representations during this period created false hope that customer assets would be recovered, while Defendants were in fact accelerating the dissipation and concealment of those assets.

117.    These assurances were designed to delay customer action, prevent panic, and forestall legal or regulatory intervention while assets were moved beyond reach.

118.    Plaintiff reasonably relied on BKEX's statements in believing that his assets might be restored and that immediate action was unnecessary.

119.    By the time BKEX announced the withdrawal suspension, Plaintiff's assets had already been removed from BKEX's custody and effectively laundered through exchanges and decentralized protocols.

120.    BKEX's suspension of withdrawals, coupled with contemporaneous asset laundering and false assurances, marked the culmination of Defendants' fraudulent scheme.

121.    As a direct result of Defendants' actions, Plaintiff was deprived of any meaningful opportunity to withdraw, protect, or recover his cryptocurrency before BKEX ceased operations.

**F.    China prosecuted BKEX officials, but Ji Jiaming escaped (2023–2024)**

122.    In 2023 and 2024, Chinese law-enforcement authorities brought criminal proceedings arising out of BKEX's operations, resulting in multiple convictions of senior BKEX personnel directly involved in custody, compliance, and user-recruitment functions.

123.    These criminal prosecutions confirmed that BKEX's misconduct reflected systemic and coordinated wrongdoing within the organization.

124.    Zheng Lei, who served as BKEX's wallet engineer and wallet department manager, was convicted of criminal offenses related to BKEX's handling of digital assets. Zheng Lei was sentenced to 25 months of imprisonment, suspended for the same period, and fined 150,000 yuan (approximately $30,000). The Chinese court further ordered the confiscation of 1.34 million yuan (approximately $187,000) in illegal profits obtained through Zheng Lei's conduct. Zheng Lei's role placed him at the core of BKEX's asset-custody and wallet-management infrastructure, and his conviction directly implicates the systems and practices used to control customer funds.

125.    Wang, a BKEX employee responsible for overseeing know-your-customer ("KYC") compliance and cryptocurrency trading operations, was also convicted in connection with BKEX's criminal conduct. Wang received a 23-month suspended sentence and was fined 52,000 yuan (approximately $10,000). Wang's responsibilities included identity verification and trading oversight.

126.    Dong, a BKEX employee tasked with recruiting users and expanding the platform's customer base, was likewise convicted for his role in the scheme. Dong developed a network of more than 10,000 sub-agents to solicit users on behalf of BKEX and earned 33,558 USDT in commissions before surrendering to authorities. Dong was sentenced to 18 months of imprisonment, suspended for the same period, and fined 35,000 yuan (approximately $6,400). Dong's conviction demonstrates that BKEX's misconduct extended beyond technical failures and encompassed aggressive, compensated user-recruitment practices designed to expand deposits and trading activity.

127.    The convictions of personnel responsible for wallet management, compliance, trading operations, and user recruitment demonstrate that BKEX's criminal conduct permeated multiple core functions of the enterprise. These individuals did not operate in isolation; rather, they occupied senior and operationally critical roles that required coordination, approval, and oversight within BKEX's management structure.

128.    The criminal judgments confirm that BKEX's misconduct involved the unauthorized handling of customer assets, deceptive operational practices, and the exploitation of customer trust for financial gain.

129.    Despite the convictions of multiple BKEX employees, Defendant Ji Jiaming, BKEX's founder and chief executive, has not publicly accepted responsibility for the misconduct.

130.    Following the initiation of criminal proceedings against BKEX personnel, Defendant Ji Jiaming failed to submit to criminal jurisdiction in China.

131.    On information and belief, Ji Jiaming remains a fugitive from Chinese law enforcement in connection with BKEX-related criminal conduct.

132.    Ji Jiaming's flight from criminal accountability is consistent with the broader pattern of concealment, asset dissipation, and evasion described throughout this Complaint.

**G.    BKEX continued to lie to customers regarding their stolen funds (2023–2024)**

133.    Following the suspension of customer withdrawals on May 29, 2023, Defendants engaged in a sustained course of misrepresentation and concealment concerning the status and recoverability of customer assets, including Plaintiff's cryptocurrency.

134.    Rather than disclosing that customer assets had been transferred out of BKEX's custody and laundered through third-party exchanges and decentralized protocols, Defendants continued to represent that customer funds remained intact and subject to potential recovery.

135.    On May 29, 2023, the same day BKEX suspended withdrawals, BKEX publicly stated that it would "do its best to restore the normal operation of the exchange," implying that the suspension was temporary and that customer assets remained available.

136.    This representation was materially misleading because, at the time it was made, Defendants knew that substantial quantities of customer assets had already been removed from BKEX's custody and placed beyond BKEX's control.

137.    Defendants did not disclose that customer cryptocurrency—including Plaintiff's BTC—had been transferred to third-party exchange wallets, dissipated, or laundered in the days and weeks preceding the withdrawal freeze.

138.    Instead, Defendants framed the withdrawal suspension as an operational interruption caused by external factors, including a criminal investigation, rather than as the result of asset misappropriation and flight.

139.    In communications disseminated through BKEX's website, social-media channels, and customer messaging platforms, Defendants repeatedly suggested that customer funds were being safeguarded and that restoration of withdrawals was a realistic and ongoing objective.

140.    Defendants represented that BKEX was maintaining "transparent and fast communication" and that customer service channels remained available to address customer concerns regarding their assets.

141.    These assurances were false and misleading because Defendants possessed information confirming that customer assets were no longer under BKEX's custody and that meaningful recovery was unlikely.

142.    Defendants' statements during this period were designed to delay customer action, suppress complaints, and prevent customers from pursuing legal remedies while assets were dissipated.

143.    Defendants did not provide customers with accurate accountings of asset movements, wallet balances, or third-party transfers, despite being in exclusive possession of such information.

144.    Defendants also failed to disclose the extent of internal wrongdoing, the involvement of senior BKEX personnel in criminal conduct, or the true scope of losses suffered by customers.

145.    Throughout 2023 and into 2024, Defendants continued to foster the impression that customer funds might be recovered.

146.    These representations created false hope and materially affected customers' understanding of their rights, remedies, and the urgency of pursuing legal action.

147.    Plaintiff reasonably relied on Defendants' representations in believing that his assets might be restored and that immediate litigation or enforcement action was unnecessary.

148.    Defendants' superior knowledge and exclusive control over relevant information placed them in a position of trust, which they exploited to conceal material facts.

149.    Defendants' misrepresentations and omissions were not the product of confusion or uncertainty, but rather, constituted knowing and intentional concealment of the finality of customer losses.

150.    By continuing to suggest that customer funds were recoverable, Defendants concealed the fact that Plaintiff's injury was complete and irreversible.

151.    Defendants' conduct during this period was designed to prevent customers from discovering the true nature and timing of their losses.

152.    As a result of Defendants' fraudulent concealment, Plaintiff did not and could not reasonably discover the full extent of Defendants' misconduct or the irretrievable loss of his assets until well after the withdrawal suspension.

153.    The continuation of false assurances after BKEX had effectively ceased operations confirms that Defendants' fraudulent scheme extended beyond the initial misappropriation of assets and included an extended period of deception.

**H.    Plaintiff's independent investigation of Ji Jiaming (2023–2025)**

154.    After BKEX suspended withdrawals and ceased meaningful operations, Plaintiff undertook an independent investigation to determine the disposition of his missing assets and to identify the individual responsible for their disappearance.

155.    Plaintiff's investigation was prompted by BKEX's failure to provide any accounting, recovery mechanism, or truthful disclosure regarding the status of customer funds.

156.    Because Defendants controlled all relevant internal records and wallet infrastructure, Plaintiff was required to rely on publicly available information, open-source intelligence, and blockchain analysis to uncover the facts.

157.    As part of this effort, Plaintiff joined a Telegram news group associated with BKEX and monitored discussions, announcements, and publicly shared information concerning BKEX and its founder, Defendant Ji Jiaming.

158.    Through this process, Plaintiff reviewed publicly available materials relating to Ji Jiaming's identity, travel, financial activity, and continued involvement in cryptocurrency markets.

159.    Plaintiff was able to establish direct contact with Ji Jiaming without disclosing that he was a BKEX customer or that he had been harmed by BKEX's conduct.

160.    Plaintiff corresponded with Ji Jiaming using the nickname "Eric," allowing Plaintiff to obtain information without alerting Ji Jiaming to the existence of a claim or investigation.

161.    During these communications, Ji Jiaming voluntarily disclosed information regarding his personal activities, travel, financial transactions, and continued access to cryptocurrency platforms.

162.    Ji Jiaming communicated with Plaintiff using a Swiss telephone number, +41 78 314 28 13, via WhatsApp, indicating ongoing access to international telecommunications and financial infrastructure.

163.    On or about June 30, 2024, Ji Jiaming sent Plaintiff a screenshot reflecting a Swiss International Air Lines flight (LX161) scheduled for July 18, 2024, from Tokyo Narita International Airport to Zurich Airport.

164.    Ji Jiaming stated that he intended to stay at an Airbnb located at Münsterhof 15, Zurich, reflecting his physical presence and mobility within Switzerland.

165.    These communications demonstrated that, notwithstanding BKEX's collapse and the criminal prosecution of other BKEX personnel, Ji Jiaming remained at liberty and actively traveling internationally.

166.    Ji Jiaming also sent Plaintiff a screenshot of a bank transfer reflecting a transfer of CHF 100,000 to Malaysia, dated March 25, 2025.

167.    The screenshot identified Ji Jiaming as the beneficiary of the transfer and referenced IBAN CH2700767000H55330242, corresponding to a Swiss bank account associated with Banque Cantonale Vaudoise, St-François branch, Lausanne.

168.    Although the identity of the account holder and the purpose of the transfer remain unknown, the transaction reflects Ji Jiaming's access to substantial financial resources and international banking channels.

169.    Ji Jiaming further disclosed to Plaintiff that he maintained an account on the cryptocurrency exchange OKX, with an account identifier partially visible as 45****9471.

170.    Ji Jiaming's disclosures confirmed that he continued to access and utilize major global cryptocurrency exchanges after BKEX suspended withdrawals.

171.    Plaintiff was also aware, based on publicly available information and Ji Jiaming's own statements, that Ji Jiaming controlled or had access to an on-chain cryptocurrency wallet with the address TFTJUzXVBrP3gDrMhm6M38fs3kvaMGd6d4.

172.    Because this wallet was an on-chain wallet, its transaction history was publicly accessible through blockchain explorers, including TronScan.

173.    Public blockchain records show that between June 2023 and August 2024, more than 2,000,000 USDT was transferred into the wallet address TFTJUzXVBrP3gDrMhm6M38fs3kvaMGd6d4 and subsequently transferred out.

174.    Blockchain analysis further revealed that a substantial portion of the USDT transferred into the wallet originated from accounts associated with the cryptocurrency exchanges OKX and Binance.

175.    Publicly available address-labeling data associated with TronScan identified multiple sender wallets as OKX and Binance exchange wallets, including hot wallets commonly used to process customer withdrawals.

176.    Between June 2023 and August 2024, approximately 1.5 million USDT was transferred from wallets associated with Binance and OKX into the wallet controlled by Ji Jiaming.

177.    These transactions demonstrate that Ji Jiaming maintained active accounts with major exchanges and used those accounts to route funds into an on-chain wallet under his control.

178.    Plaintiff's investigation revealed that Ji Jiaming continued to control substantial financial resources while BKEX customers were left without access to their assets.

179.    Plaintiff's investigation confirmed that Defendants' misconduct extended beyond BKEX's operational collapse and included ongoing concealment and evasion by Ji Jiaming.

180.    Plaintiff's investigation further corroborated that Ji Jiaming exercised control over assets traceable to exchange activity during and after the period in which customer withdrawals were suspended.

## COMMODITY EXCHANGE ACT
## STATUTORY FRAMEWORK

181.    The CEA, 7 U.S.C. § 1 *et seq.*, establishes a comprehensive regulatory regime governing commodities, swaps, and commodity-linked trading activity, and prohibits the use of manipulative or deceptive devices in connection with such transactions.

182.    The Commodity Futures Trading Commission ("CFTC") has long recognized that virtual currencies—including BTC and ETH—are "commodities" within the meaning of the CEA, 7 U.S.C. § 1a(9), and courts have repeatedly treated transactions involving such digital assets as subject to the Act's antifraud provisions when conducted in interstate commerce.

183.    Section 9(1) of the CEA, 7 U.S.C. § 9(1), makes it unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, any manipulative or deceptive device or contrivance in connection with any swap, or any contract of sale of any commodity in interstate commerce, or for future delivery, in contravention of CFTC rules.

184.    CFTC Rule 180.1(a), 17 C.F.R. § 180.1(a), implements Section 9(1) and broadly prohibits fraud, misrepresentations, omissions of material fact, and deceptive schemes in connection with commodity transactions. Rule 180.1 applies to conduct undertaken intentionally or recklessly and is modeled on Section 10(b) of the Securities Exchange Act and Rule 10b-5, but is not limited to traditional market-manipulation claims.

185.    The CEA provides a private right of action under 7 U.S.C. § 25(a)(1) for any person who suffers actual damages resulting from a violation of the Act in connection with specified commodity transactions, including where a plaintiff deposits money, securities, or property with a defendant in connection with an order to make a contract of sale of a commodity for future delivery or any swap, or where the violation involves the use of a manipulative or deceptive device in connection with such transactions.

186.    Liability under the CEA extends not only to primary violators but also to individuals who willfully aid and abet, counsel, induce, procure, or otherwise participate in violations of the Act. *See* 7 U.S.C. § 13c(a).

187.    In addition, any person who directly or indirectly controls a violator may be held liable as a controlling person where that individual failed to act in good faith or knowingly induced the violative conduct. *See* 7 U.S.C. § 13c(b).

188.    These provisions are intended to protect market participants from fraud and deception, preserve the integrity of commodity markets, and prevent intermediaries from misusing customer capital or misrepresenting the nature, custody, or risks of commodity-linked transactions.

## CAUSE OF ACTION

### VIOLATIONS OF THE COMMODITY EXCHANGE ACT
### 7 U.S.C. § 9(1); CFTC Rule 180.1(a); 7 U.S.C. § 25(a)(1)); 7 U.S.C. § 13c
### (BY PLAINTIFF AGAINST ALL DEFENDANTS)

189.    Plaintiff repeats and realleges every allegation contained in the foregoing paragraphs as if fully set forth herein.

190.    BTC, ETH, U.S. dollar-denominated stablecoins, and cryptocurrencies as virtual currencies constitute "commodities" within the meaning of the CEA, 7 U.S.C. § 1a(9).

191.    BKEX is a defunct, centralized cryptocurrency exchange, which custodied customers' cryptocurrencies and enabled a variety of leveraged cryptocurrency trading options. Defendants operated BKEX as a centralized digital asset trading platform that functioned as an intermediary for commodity transactions, including spot trading, margin trading, leveraged contract trading, perpetual derivatives, yield-bearing products, and other commodity-linked financial services.

192.    BKEX held itself out to customers as a global commodities trading venue, representing that it maintained independent custody of customer assets, operated internal order-matching and settlement systems, and provided customers with real-time account balances reflecting assets available for trading or withdrawal.

193.    To access BKEX's trading services, customers, including Plaintiff, deposited cryptocurrency with BKEX, relinquishing possession and control of those assets to Defendants for use as trading capital, margin, collateral, and settlement assets in connection with commodity transactions executed on the platform.

194.    Plaintiff deposited substantial quantities of BTC, ETH, and stablecoins with BKEX for the purpose of engaging in commodity-linked trading activity offered by Defendants.

195.    Defendants exercised exclusive control over the custody, movement, accounting, and disposition of its customers' cryptocurrency deposits, including unilateral authority to transfer assets, reflect balances on internal ledgers, and restrict or permit withdrawals.

196.    In connection with these deposits and the commodity trading activity they enabled, Defendants devised, implemented, and executed a deceptive scheme to defraud Plaintiff.

197.    Defendants represented, expressly and by omission, that cryptocurrency deposited on BKEX would remain under BKEX's custody, would not be transferred to third parties without customer authorization, and would be available for withdrawal upon demand.

198.    Defendants further represented that BKEX operated as an independent exchange and custodian, and they did not disclose that customer assets would be routed or pooled through third-party exchanges or external platforms, including Binance.

199.    Defendants routinely and systematically transferred customer BTC—including Plaintiff's deposits—in matching quantities and close temporal proximity to third-party exchange wallets, including wallets controlled by Binance, without disclosure or customer authorization.

200.    These transfers occurred shortly after customer deposits were received and reflected a consistent operational practice, not isolated errors, demonstrating that Defendants never intended to maintain exclusive custody of customer assets as represented.

201.    Defendants did not inform Plaintiff that his deposited BTC would be transferred to Binance-controlled wallets, nor did they provide any disclosure that customer assets would be exposed to the custody, control, and risks of third-party exchanges.

202.    Once transferred, Plaintiff's BTC was placed beyond his control and outside BKEX's direct custody, yet Defendants continued to represent to Plaintiff that his assets remained available within his BKEX account.

203.    Defendants maintained internal ledgers and user-facing account balances that continued to reflect Plaintiff's BTC as held by BKEX, thereby concealing the true disposition of those assets and creating a false appearance of solvency and custody.

204.    Defendants' internal accounting practices were designed to mislead customers by masking the removal of assets from BKEX's custody while inducing customers to continue trading, depositing, and maintaining balances on the platform.

205.    Defendants' misrepresentations and omissions were material because custody, control, and withdrawal availability are fundamental considerations for customers deciding whether to deposit assets and engage in commodity-linked trading.

206.    Defendants' deceptive conduct occurred in connection with contracts of sale of commodities in interstate commerce and with commodity-linked trading activity conducted through the BKEX platform.

207.    Defendants' scheme induced Plaintiff and other customers to deposit cryptocurrency, to use those deposits as margin or trading capital, and to engage in commodity trading activity that generated fees, liquidity, and reputational benefits for Defendants.

208.    Defendants' conduct constituted more than mere misappropriation; it was an integrated deceptive scheme that combined false custody representations, concealed asset transfers, and misleading internal ledgering to extract and misuse customer trading capital.

209.    Defendants knew, or were reckless in not knowing, that transferring customer cryptocurrency to third-party exchange wallets without disclosure or authorization contradicted their representations and exposed customer assets to undisclosed risks.

210.    Defendants acted intentionally or, at minimum, with reckless disregard for the truth, the safety of customer assets, and their obligations under the CEA.

211.    Defendants' conduct constituted the use or employment of a manipulative or deceptive device, scheme, or artifice to defraud in violation of 7 U.S.C. § 9(1) and CFTC Rule 180.1(a).

212.    Defendants also made untrue and misleading statements of material fact, and omitted material facts necessary to make their statements not misleading, in connection with commodity transactions, in further violation of CFTC Rule 180.1(a).

213.    As a direct and proximate result of Defendants' deceptive conduct, Plaintiff deposited cryptocurrency with BKEX, relied on Defendants' custody representations, and engaged in commodity-linked trading activity on the platform.

214.    Plaintiff suffered substantial losses when his deposited cryptocurrency was misappropriated, rendered unrecoverable, and placed beyond his control because of Defendants' scheme.

215.    Plaintiff brings this action pursuant to 7 U.S.C. § 25(a)(1) as a person who deposited property with Defendants in connection with commodity trading activity and suffered actual damages caused by Defendants' violations of the CEA.

216.    Defendant Ji Jiaming founded BKEX, held himself out as its Chief Executive Officer, and exercised ultimate authority over the platform's operations, custody practices, and representations to customers.

217.    Ji Jiaming had the power to control and did control BKEX's handling of customer assets, including decisions to transfer customer cryptocurrency off-platform and to conceal those transfers through misleading internal accounting.

218.    Ji Jiaming authorized, directed, or knowingly permitted the deceptive practices described herein, including the routine routing of customer assets to third-party exchanges.

219.    Ji Jiaming was aware, or recklessly disregarded, that BKEX's custody representations were false and that customers were being misled regarding the safety and availability of their deposited assets.

220.    Ji Jiaming personally benefited from BKEX's deceptive scheme through the extraction of liquidity, the maintenance of trading volume, and the continued operation of the platform despite its misuse of customer assets.

221.    Ji Jiaming is therefore liable as a primary violator of the CEA for directly participating in the fraudulent scheme described herein.

222.    In the alternative, Ji Jiaming is liable under 7 U.S.C. § 13c(a) for aiding and abetting, counseling, inducing, or procuring BKEX's violations of the CEA.

223.    Ji Jiaming knowingly provided substantial assistance to BKEX's violations by maintaining control over operations, failing to stop known misconduct, and permitting deceptive custody practices to continue.

224.    In the alternative, Ji Jiaming is liable under 7 U.S.C. § 13c(b) as a controlling person who directly or indirectly controlled BKEX and failed to act in good faith or knowingly induced the acts constituting the violations.

225.    Ji Jiaming did not act in good faith because he failed to implement safeguards to prevent misuse of customer assets and failed to correct known misrepresentations regarding custody and asset availability.

226.    Defendants' violations of the CEA were a substantial factor in causing Plaintiff's losses and were the foreseeable consequence of Defendants' deceptive scheme.

227.    Plaintiff's damages include the loss of his deposited cryptocurrency, the loss of the ability to withdraw or trade those assets, and the loss of the benefit of his bargain in depositing assets for commodity trading.

228.    Defendants' conduct undermined the integrity of commodity markets by distorting trading activity, misrepresenting liquidity, and deceiving customers regarding the true risks of participating on the BKEX platform.

229.    Defendants' scheme also created systemic risk by exposing customer assets to undisclosed third-party custody and counterparty risk while falsely portraying BKEX as a solvent and independent custodian.

230.    The CEA was enacted to prevent precisely this type of deceptive conduct in connection with commodity transactions and to protect market participants from fraud and manipulation.

231.    Defendants' actions fall squarely within the conduct prohibited by 7 U.S.C. § 9(1) and CFTC Rule 180.1(a), and liability attaches regardless of whether Defendants labeled their products as "crypto" rather than commodities.

232.    Defendants cannot avoid liability by characterizing their misconduct as mere theft, as the scheme was executed through misrepresentations and omissions made in connection with commodity trading activity.

233.    Defendants' violations were ongoing and continuous, extending from the time Plaintiff deposited assets through the concealment of asset transfers and the eventual loss of Plaintiff's cryptocurrency.  Plaintiff did not and could not reasonably discover the true nature of Defendants' scheme until Defendants suspended withdrawals and the concealment of asset transfers was revealed.

234.    Defendants' concealment of material facts further demonstrates scienter and reinforces their liability under the CEA.

235.    As a result of Defendants' violations, Plaintiff has suffered actual damages within the meaning of 7 U.S.C. § 25(a), including the loss of cryptocurrency worth approximately $8 million.

236.    Plaintiff seeks all relief available under the CEA, including actual damages, prejudgment interest, costs, and such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, and award the following relief:

A. <u>Actual Damages</u>: An award of actual and compensatory damages in an amount to be determined at trial, including but not limited to the value of Plaintiff's misappropriated cryptocurrency and all losses proximately caused by Defendants' unlawful conduct, pursuant to 7 U.S.C. § 25(a) and applicable law.

B. <u>Prejudgment and Post-Judgment Interest</u>: An award of prejudgment and post-judgment interest at the maximum rate permitted by law, to fully compensate Plaintiff for the loss of use of his assets.

C. <u>Equitable and Ancillary Relief</u>: All appropriate equitable and ancillary relief necessary to prevent Defendants from retaining the benefits of their misconduct, including but not limited to disgorgement, restitution, accounting, and constructive trust remedies to the extent available.

D. <u>Costs and Fees</u>: An award of Plaintiff's costs of suit and reasonable attorneys' fees to the extent permitted by statute, equity, or applicable law.

E. <u>Declaratory Relief</u>: A declaration that Defendants' conduct violated the CEA and other applicable law, as alleged herein.

F. <u>Injunctive Relief</u>: Such injunctive or prohibitory relief as the Court deems just and proper to prevent ongoing or future violations, including relief barring Defendants from engaging in similar misconduct.

G. <u>Such Other and Further Relief</u>: Such other and further legal or equitable relief as the Court deems just, proper, and equitable under the circumstances.

Dated:  February 17, 2026

By:  **/s/ T. Liam Murphy, Esq.**

Thomas Liam Murphy, Esq.
Murphy's Law: The Crypto Law Firm
murphyslawcrypto.com
Phone: (913) 575-0540
Email: liam@murphyslawcrypto.com
New York Bar # 5853759

*Attorney for Plaintiff Xiaoliang Mou*