UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/19/2026

XIAOLIANG MOU and TERRY HANSON, individually, and on behalf of all others similarly situated,

Plaintiff,

-against-

BTC KING TECHNOLOGY CO., LTD. (d/b/a "BKEX"), JI JIAMING, BINANCE HOLDINGS LIMITED (d/b/a "Binance" and "Binance.com"), and AUX CAYES FINTECH CO. LTD. (d/b/a "OKX" and formerly d/b/a "OKEx"),

Defendants.

No. 26-cv-01311 (CM)

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT JI JIAMING'S MOTION TO DISMISS**

McMahon, J:

Lead Plaintiffs Xiaoliang "Eric" Mou and Terry Hanson (together, "Plaintiffs") bring this class action against Defendants BTC King Technology Co., Ltd. (d/b/a "BKEX") and Ji Jiaming ("Ji" or "Defendant Ji") for claims of manipulation and fraud in violation of the Commodity Exchange Act, 17 U.S.C. §§ 9(1), 25(a)(1), and 17 C.F.R. § 180.1(a), and common law fraud, conversion, and unjust enrichment: and Binance Holdings Limited (d/b/a "Binance" and "Binance.com") and Aux Cayes Fintech Co. Ltd. (d/b/a "OKX" and formerly d/b/a "OKEx") for aiding and abetting manipulation and fraud in violation of the Commodity Exchange Act, 17

U.S.C. §§ 9(1). 13c(1), 25(a)(1). and 17 C.F.R. § 180.1(a), and common law auding and abetting conversion.

Before the Court is Defendant Ji's motion to dismiss Plaintiffs' Amended Complaint for lack of personal jurisdiction and for failure to state a claim.

For the reasons set forth below, Ji's motion to dismiss is GRANTED without prejudice for want of personal jurisdiction. In the alternative, his motion to dismiss is also GRANTED as to Plaintiff Mou for failure to state a claim and GRANTED as to Plaintiff Hanson due to the statute of limitations, with prejudice. Ji's motion to dismiss the common law claims for lack of supplemental jurisdiction is also GRANTED.

**Background**

The following facts are taken from Plaintiffs' complaint. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). For the purpose of deciding this motion to dismiss, the Court assumes these facts are true and construes them in the light most favorable to Plaintiffs as the non-moving parties. *See Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013).

BTC King Technology Co. Ltd. (d/b/a "BKEX") is a global digital-asset trading and financial products platform which allowed customers to deposit and retain cryptocurrency. Dkt. 30, Am. Class Action Compl., ¶ 1. BKEX was founded on May 9, 2018, and is incorporated in the British Virgin Islands with alleged operations, business-development activities, and customer solicitation in multiple jurisdictions, including China, Hong Kong, Singapore, Japan, Korea, and the United States. Dkt. 30, ¶¶ 17–18. BKEX was founded by Defendant Ji Jiaming ("Ji" or "Defendant Ji"), who is also the principal executive and controlling executive of BKEX, and held himself out as the Chief Operating Officer (CEO). Dkt. 30, ¶¶ 19, 37, 73. Ji is a Chinese citizen who currently resides in Japan. Dkt. 30, ¶ 20. Plaintiffs allege that, as "BKEX's founder

and controlling executive, Ji oversaw the company's efforts to cultivate customer trust, portray BKEX as a leading global trading platform, promote its expanding suite of financial products, and induce users to deposit and retain cryptocurrency under BKEX's custody." Dkt. 30, ¶ 74.

Lead Plaintiffs Xiaoliang "Eric" Mou and Terry Hanson (together, "Plaintiffs") allege that, as part of BKEX's business strategy, "BKEX purposefully directed substantial, repeated, and non-incidental conduct toward the United States as part of a deliberate strategy to establish legitimacy, attract customers, solicit deposits, and expand BKEX's cryptocurrency trading business in the U.S. market." Dkt. 30, ¶ 30. Included in this strategy were alleged public statements made by Ji, including statements touting BKEX's placement on CoinMarketCap, a cryptocurrency-market data aggregator, which Ji claimed in a 2019 interview placed BKEX in a top three position within one year, and public conference coverage attributed to Ji in which he claimed that BKEX had grown to approximately two million registered users, exceeding 60,000 daily active users, expanded to more than 130 trading pairs, and achieved a top-five or top-seventeen global ranking on CoinMarketCap. Dkt. 30, ¶¶ 75–78. Plaintiffs allege that Ji "served as the public face of BKEX's legitimacy campaign, personally amplified the metrics used to portray BKEX as a top global exchange, and publicly articulated the company's expansion into international markets." Dkt. 30, ¶ 81.

Through this publicity, BKEX allegedly released a promotional article on September 27, 2021, in English, representing BKEX as "'a leading digital asset financial service platform in the world,' [which] maintained 'independent trading and operations centers across jurisdictions' including the United States . . . ." Dkt. 30, ¶ 88. BKEX's U.S.-directed conduct allegedly also included:

a. Registering as a Money Services Business with the U.S. Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") and repeatedly

invoking the registration in outward-facing marketing, promotional materials, and platform communications to signal U.S. regulatory credibility;

b. Representing publicly that BKEX maintained operations, trading centers, or an "operation center" in the United States, including statements that BKEX maintained independent trading and operating centers in the United States and other major jurisdictions;

c. Publishing and disseminating English-language promotional content invoking U.S. regulatory and operational connections, including materials that portrayed BKEX as globally regulated and institutionally credible exchange with United States ties;

d. Conducting physical marketing, promotional, and business-development activities in the United States, including appearances by BKEX representatives at cryptocurrency conferences and industry events in U.S. cities, including San Francisco and Miami;

e. Holding itself out through company representatives as having a San Francisco-based presence, thereby representing that BKEX's team and operations extended into the United States;

f. Soliciting, accepting, and maintaining U.S. customers on the BKEX platform, including Plaintiff Terry Hanson and other U.S. users, who deposited cryptocurrency with BKEX and were subjected to the same deceptive custody model and withdrawal freeze challenged in this action;

g. Maintaining web-based, mobile, social-media, Telegram, and other solicitation and customer-access channels available to U.S. users, without effective or consistently enforced measures excluding United States residents from the BKEX platform;

h. Participating in listing, promotional, investment, and business-development activity involving U.S.-domiciled or U.S.-linked blockchain projects, thereby integrating BKEX into the U.S. cryptocurrency ecosystem and cultivating U.S. market credibility; and

i. Using U.S.-based commercial and digital infrastructure, including registering and maintaining BKEX's primary domain through GoDaddy, a U.S.-based domain registrar.

Dkt. 30, ¶ 31. Plaintiffs also allege BKEX has a United States "investment arm . . . integrated into the broader BKEX organization" called BKEX Labs, which was "mainly based in China, Singapore, Thailand and San Francisco." Dkt. 30, ¶ 90. To support this allegation, they point to a June 2022 interview with Devin Pan, a former investment partner of BKEX Labs. Dkt. 30, ¶ 90.

As a part of this alleged U.S.-facing expansion and marketing campaign, Plaintiffs further allege that Ji "exercised authority over BKEX's business strategy, geographic expansion, regulatory posture, public messaging, wallet infrastructure, custody practice, and customer-facing representations." Dkt. 30, ¶ 37. Plaintiffs allege that, in this capacity, Ji:

> personally authorized, directed, approved, and/or ratified BKEX's strategy of cultivating U.S. credibility and U.S. customers, including BKEX's decisions to:
>
> a. Obtain and publicly tout FinCEN MSB registration;
>
> b. Represent that BKEX maintained operations, trading centers, or an "operation center" in the United States;
>
> c. deploy U.S.-facing marketing and promotional materials to portray BKEX as a globally legitimate exchange;
>
> d. permit BKEX representatives to conduct marketing and business-development activities at U.S. cryptocurrency events;
>
> e. maintain an exchange platform available to U.S. users; and
>
> f. solicit, accept, and retain customer deposits from U.S. residents, including Plaintiff Hanson.

Dkt. 30, ¶ 38.

Plaintiffs allege that BKEX induced customers, including Lead Plaintiffs Xiaoliang "Eric" Mou and Terry Hanson, "to deposit and retain cryptocurrency by presenting itself as a legitimate, liquid, internationally established exchange capable of safely holding and returning customer assets." Dkt. 30, ¶ 1. Plaintiff Xiaoliang "Eric" Mou is a Chinese citizen who has

resided in Switzerland since 2021. Dkt. 30, ¶ 14. He deposited cryptocurrency on the BKEX trading platform in the amount of 115.93 Bitcoin ("BTC"), 14.908 Ethereum ("ETH"), and $53,640 in U.S. dollar-denominated stablecoins. Dkt. 30, ¶¶ 14, 121–25. Plaintiffs allege that Mou's deposits directly interfaced with U.S.-linked exchange infrastructure, because he engaged in deposits to and withdrawals from BKEX from Kraken, "a major cryptocurrency exchange with substantial operations in the United States." Dkt. 30, ¶ 129. Plaintiff Terry Hanson is a U.S. citizen and resident of California. Dkt. 30, ¶ 15. While located in California, Hanson opened and used a BKEX account, accessed BKEX's trading platform from the United States, and deposited approximately $5,000 worth of cryptocurrency in BKEX accounts. Dkt. 30, ¶¶ 15, 130–32.

Plaintiffs allege that BKEX's appearance was deceptive. Dkt. 30, ¶¶ 3, 69. Specifically, Plaintiffs allege that BKEX secretly operated an undisclosed customer-asset routing model under which cryptocurrency deposited into BKEX-designated customer addresses was transferred off-platform into third-party exchange infrastructure without customer authorization or disclosure, even as BKEX continued to display internal account balances suggesting that those assets remained safely held and withdrawable. Dkt. 30, ¶¶ 3, 69, 113–14. Plaintiffs provide an example that, between July 2022 and December 2022, Plaintiff Mou made a series of Bitcoin deposits to a BKEX-designated deposit address. following which corresponding amounts of Bitcoin were transferred out of that BKEX-designated address either the same day or shortly thereafter. Dkt. 30, ¶ 141. The cryptocurrency is then alleged to have been routed into wallets associated with Defendant Binance, placing the assets outside of Plaintiffs knowledge, control, and practical ability to recover. Dkt. 30, ¶¶ 3, 69. In an alleged culmination of this scheme, on May 29, 2023, BKEX abruptly suspended customer withdrawals, representing to customers that this was a temporary and operational suspension. Dkt. 30, ¶¶ 5, 71.

There are no allegations in the pleading that amounts of Bitcoin corresponding to Hanson's investment, like Mou's, were immediately offloaded to a third-party account. However, Hanson is also alleged to have been subjected to this withdrawal freeze. Dkt. 30, ¶¶ 41, 134.

Plaintiffs allege that, during this suspension, BKEX misled customers by representing that the customers' assets were still in their accounts and that the withdrawal freeze was temporary. Dkt. 30, ¶¶ 190–92. Plaintiffs further allege that, "In June 2023, affected investors participated in or learned of communications with an intermediary who represented that she had direct access to Ji and . . . reinforced the understanding among affected investors that BKEX's status remained tied to a fluid legal process rather than a confirmed and final misappropriation of funds." Dkt. 30, ¶ 194–95. Meanwhile, BKEX allegedly engaged in a massive outflow of cryptocurrency, which removed customer assets from BKEX's apparent custody and dissipated any remaining assets in the waiting period – an alleged scheme aided by cryptocurrency exchange, custodial wallet, and transaction-processing services provided to BKEX and Ji by Defendants Binance Holdings Limited ("Binance") and Aux Cayes FinTech Co. Ltd., doing business as OKX ("OKX"). Dkt. 30, ¶¶ 5, 8, 21–24. Plaintiffs allege that, during the withdrawal suspension, while BKEX customers remained unpaid, "a wallet controlled by or accessible to Ji received more than 2 million USDT between June 2023 and August 2024, including approximately 1.5 million USDT from wallets associated with Binance and OKX." Dkt. 30, ¶ 8.

From August 2023 through June 2024, Plaintiff Mou independently investigated BKEX, engaging in private investigation to locate Ji and learn what happened to his funds. Dkt. 30, ¶¶ 196–200. While Plaintiff Mou was able to locate Ji online and verify his identity in June 2024, he was unable to confirm any information about Ji's involvement in BKEX's fraudulent routing scheme, misappropriation of funds, and misrepresentation. Dkt. 30, ¶ 201. However, "[i]n

November 2024, the People's Court of Pingjiang County, Hunan Province, entered a criminal judgment arising from BKEX's operations," and identified Defendant Ji as a principal operator and fugitive. Dkt. 30, ¶ 209. This, Plaintiffs allege, was the "first authoritative public confirmation of BKEX's criminal operations and Ji Jiaming's central role" in the conduct underlying this complaint. Dkt. 30, at ¶ 202. After this confirmation, Plaintiff Mou continued to engage in investigation, forensic analysis, and foreign court proceedings to determine what had happened to his own cryptocurrency. Dkt. 30, ¶¶ 203–05. The Amended Complaint does not make allegations about Plaintiff Hanson's knowledge, actions, or inquiry after the withdrawal freeze.

Plaintiffs allege that Ji personally "controlled or directed a Binance account implicated in BKEX's customer-deposit routing system," and that he was "plausibly connected to the infrastructure through which BKEX customer assets were moved and concealed." Dkt. 30, ¶ 4. Plaintiffs find additional support for their allegations in a subsequent criminal proceeding in China, which Plaintiffs allege "confirmed the fraudulent character of BKEX's operations and Defendant Ji Jiaming's central role." Dkt. 30, ¶ 72; Dkt. 30, ¶ 7. Plaintiffs allege that "Chinese courts convicted BKEX personnel involved in wallet management, KYC and trading oversight, and user recruitment; confirmed that customer assets had been removed from the platform before or in connection with the withdrawal freeze; and identified Ji as a central operator and fugitive." Dkt. 30, ¶¶ 7, 219.

Plaintiffs allege Binance knowingly and substantially assisted BKEX and Ji when they "received, custodied, consolidated, processed, and transferred cryptocurrency traceable to BKEX customer assets through Binance-controlled exchange infrastructure, including Plaintiff Mou's BTC." Dkt. 30, ¶¶ 10, 328. Plaintiffs further allege that OKX "knowingly and substantially

assisted BKEX's and Ji's CEA violations." Dkt. 30, ¶¶ 347. Plaintiffs allege that OKX "maintained exchange infrastructure and accounts used by Ji and/or persons acting in concert with him to receive, custody, process, and transfer substantial cryptocurrency after BKEX suspended withdrawals," Dkt. 30, ¶¶ 10, 23, and "knowingly and substantially assisted the same scheme through its post-collapse exchange infrastructure," Dkt. 30, ¶ 11. To support these allegations, Plaintiffs state that Binance pleaded guilty in the United States to federal criminal charges arising from its operation of the global Binance exchange by targeting U.S. customers while refusing to comply with U.S. law. Dkt. 30, ¶¶ 47–52. Plaintiffs also state OKX pleaded guilty in the S.D.N.Y. to operating an unlicensed money transmitting business in connection with its operation of the OKX exchange from approximately 2018 to early 2024. Dkt. 30, ¶¶ 55–57.

(i) Relevant Procedural History

On February 19, 2026, Plaintiff Mou brought this action individually against BKEX and Ji Jiaming, alleging that the defendants' conduct constituted the use or employment of a manipulative or deceptive device, scheme, or artifice to defraud in violation of the Commodity Exchange Act. Dkt. 3. On February 26, 2026, Plaintiff Mou moved for permission to serve Defendant Ji and BKEX using alternative electronic service pursuant to Rule 4(f)(3) and 4(h)(2), Dkt. 7–8, which the Court granted. Dkt. 15. On April 29, 2026, after having been so served, Defendant Ji filed a motion to dismiss the Complaint, Dkt. 24–25. Plaintiffs (now including Hanson and all others similarly situated, as well as Mou) responded by filing the Amended Class Action Complaint ("Amended Complaint") on May 20, 2026. Dkt. 30.

On June 26, 2026, Defendant Ji moved to dismiss the Amended Complaint for lack of personal jurisdiction and failure to state a claim. Dkt. 46–47.

## Legal Standard

I. Rule 12(b)(2)

> On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of establishing jurisdiction. Where, as here, the Court decides the motion without an evidentiary hearing, Plaintiffs "need only make a *prima facie* showing of personal jurisdiction over the defendant[s]." *Sullivan v. UBS AG*, 149 F.4th 206, 217 (2d Cir. 2025) (quoting *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)). The Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Id.* (quoting *Chloe*, 616 F.3d at 163). Specific personal jurisdiction ordinarily must be established "with respect to each claim asserted." *Id.* (quoting *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018)).

*Aguilar v. Baton Corp.*, 25-cv-880 (CM), 2026 WL 2568764, at *9 (S.D.N.Y. Aug. 31, 2026) (alterations in original).

> In considering whether the plaintiffs have met this burden, "we will not draw 'argumentative' inferences in the plaintiff's favor," *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994), nor are we required "to accept as true a legal conclusion couched as a factual allegation," *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998).

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012). On a motion to dismiss, "A plaintiff may not rely on conclusory statements without any supporting facts, as such allegations would lack the factual specificity necessary to confer jurisdiction." *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 229 (S.D.N.Y. 2019) (quoting *Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14 Civ. 3765, 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014)).

II. Rule 12(b)(6)

> To survive a motion under Rule 12(b)(6), a complaint must contain sufficient factual matter to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when the pleaded facts allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts well-pleaded factual allegations as true and draws reasonable inferences in

> Plaintiffs' favor, but it need not accept "legal conclusions couched as factual allegations." *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

*Aguilar*, 2026 WL 2568764, at *9.

**Discussion**

I. Personal Jurisdiction

Defendant Ji brings a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction. Dkt. 47, at 6.

> Before a court may exercise personal jurisdiction over a defendant, three requirements must be met: (1) the plaintiff's service of process upon the defendant must have been procedurally proper; (2) there must be a statutory basis for personal jurisdiction that renders such service of process effective; and (3) the exercise of personal jurisdiction must comport with constitutional due process principles.

*Republic of Guatemala v. IC Power Asia Dev. Ltd.*, 619 F. Supp. 3d 421, 429 (S.D.N.Y. 2022) (quoting *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 121 (2d Cir. 2021)) (citation modified). "Where, as here, a court relies on pleadings and affidavits . . . the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant." *JCorps Int'l, Inc. v. Charles & Lynn Schusterman Fam. Found.*, 828 F. App'x 740, 742 (2d Cir. 2020) (quoting *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001)) (citations omitted). The issue can of course be revisited after discovery. *Becker v. DPC Acquisition Corp.*, 00-cv-1035, 2001 WL 246385, at *6 (S.D.N.Y. Mar. 13, 2001).

1. Service of Process Upon Defendant Ji Was Procedurally Proper.

"First, the plaintiff's service of process upon defendant must have been procedurally proper." *Licci*, 673 F.3d at 59; *Provencher v. Bimbo Foods Bakeries Distrib. LLC*, 175 F.4th 180, 185 (2d Cir. 2026). Rule 4(f) of the Federal Rules of Civil Procedure governs serving process on an individual who is in a foreign country, such as Defendant Ji. Such service of process may be

completed, among other options, by "means not prohibited by international agreement, as the court orders." FED. R. CIV. P. 4(f)(3).

On March 18, 2026, the Court granted Plaintiffs' Motion for Alternative Service Pursuant to Federal Rules of Civil Procedure 4(f)(3) and 4(h)(2). Dkt. 15. Pursuant to this order, Plaintiffs served Defendant Ji by email, WhatsApp message, and direct message on X on March 18, 2026, as confirmed by the Declaration of Liam Murphy Regarding Service of Process. Dkt. 16.

Defendant Ji does not contest the propriety or adequacy of service; he has appeared in the lawsuit. *See Licci*, 673 F.3d at 59.

2. There is Statutory Basis for Personal Jurisdiction that Renders Service of Process Effective.

"Second, there must be a statutory basis for personal jurisdiction that renders such service of process effective. The available statutory bases in federal courts are enumerated by Federal Rule of Civil Procedure 4(k)." *Id.*; *Provencher*, 175 F.4th at 185–86.

Plaintiffs rely on Rule 4(k)(2), commonly known as the federal long arm statute, which provides that, in a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:

> (A) the defendant is not subject to jurisdiction in any state's court of general jurisdiction; and
> (B) exercising jurisdiction is consistent with the United States Constitution and laws.

FED. R. CIV. P. 4(k)(2); *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 239 (S.D.N.Y. 2019).

The claim against Ji in this case arises under the CEA, a federal law. 7 U.S.C. § 25(c). Plaintiffs do not contend that Ji is subject to jurisdiction in any state's court of general jurisdiction. So the question is whether exercising jurisdiction over him is consistent with the

Constitution and laws. *See Porina v. Marward Shipping Co.*, 521 F.3d 122 (2d Cir. 2008); *Dardana Ltd. v. Yuganskneftegaz*. 317 F.3d 202, 207 (2d. Cir. 2003) ("Rule 4(k)(2) confers personal jurisdiction over a defendant so long as the exercise of jurisdiction comports with the Due Process Clause of the Fifth Amendment.").

Defendant Ji is correct when he cites *Dardana* to counter Plaintiffs' claim that Rule 4(k)(2) establishes jurisdiction. Dkt. 52, at 6. It does not. As this court recently held, the Rule only provides a basis for personal jurisdiction if the exercise of jurisdiction comports with constitutional due process principles. *Aguilar*, 2026 WL 2568764, at *16; *see also Republic of Guatemala*, 619 F. Supp. 3d at 429 (quoting *Schwab Short-Term Bond Market Fund v. Lloyds Banking Group PLC*, 22 F.4th 103, 121 (2d Cir. 2021)).

However:

> The constitutional [due process] inquiry changed substantially after *Fuld v. Palestine Liberation Organization*, 606 U.S. 1 (2025). The Supreme Court "decline[d] to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment," explaining that the Fifth Amendment permits "a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Id.* at 15–16. *Fuld* did not define the outer boundary of that authority, but it sustained the statute before it because jurisdiction was tied to conduct bearing "a meaningful relationship to the United States." *Id.* at 23.

*Aguilar*, 2026 WL 2568764, at *10 (second alteration in original). Under Rule 4(k)(2), this requires a court to look at the defendant's relationship and contacts with the United States as a whole. *See Fuld*, 606 U.S. at 22 (reviewing the "decades of 'meaningful contacts, ties. [and] relations'" the defendant has with the United States (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (alteration in original))); *George Moundreas & Co SA v. Jinhai Intelligent Mfg. Co.*, 20-CV-2626, 2021 WL 168930, at *11 (S.D.N.Y. Jan. 18, 2021) (stating that "[t]he Rule 4(k)(2) jurisdictional analysis mirrors that of the standard personal jurisdictional analysis," however, with a minimum contacts analysis that "hinges on whether the non-resident

has sufficient minimum contacts with the United States as a whole instead of the specific forum state"); *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 239 (S.D.N.Y. 2019).

Additionally, in *Orient Plus*, Judge Rochon considered *Fuld*'s changes to the due process inquiry and determined that:

> it makes good sense to conduct some form of 'meaningful relationship' or 'meaningful nexus' analysis, consistent with *Fuld*, to assess whether the extraterritorial exercise of personal jurisdiction over a noncitizen defendant would be consistent with the Fifth Amendment. . . . But . . . the Court must also be mindful not to embrace a thinly disguised minimum-contacts test, which the *Fuld* Court explicitly rejected.

*Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*, 808 F. Supp. 3d 609, 619 (S.D.N.Y. 2025) (citing *Fuld*, 606 U.S. at 24). *Orient Plus* borrowed from the Second Circuit's "sufficient nexus test," under which "whether extraterritorial application violates due process depends on whether there is a sufficient nexus between defendant and the United States such that application would be neither arbitrary nor fundamentally unfair." *Id.* (quoting *United States v. Mostafa*, 965 F. Supp. 2d 451, 458 (S.D.N.Y. 2013)) (citation modified). This test is more expansive than the minimum contacts inquiry, and is grounded in the sovereignty considerations underlying *Fuld*, while still "ensur[ing] that a United States court will assert jurisdiction only over a defendant who 'should reasonably anticipate being haled into court' in this country." *Id.* at 619–20 (quoting *United States v. Bin Laden*, 92 F. Supp. 2d 189, 219 (S.D.N.Y. 2000)).

While *Fuld*'s due process inquiry is a more flexible standard than minimum contacts, "any defendant possessing 'sufficient minimum contacts with the forum would also satisfy the . . . standards set forth in *Fuld*.'" *A.A. v. Omnicom Grp., Inc.*, 25-CV-3389, 2026 WL 504904, at *7 n.1 (S.D.N.Y. Feb. 24, 2026) (alteration in original) (quoting *In re Fairfield Sentry Ltd.*, 671 B.R. 404, 418 (Bankr. S.D.N.Y. 2025)). "[M]inimum contacts necessary to support [specific] jurisdiction exist where the defendant purposefully availed itself of the privilege of doing

business in the forum and could foresee being haled into court there." *Eades v. Kennedy, PC L. Offs.*, 799 F.3d 161, 167–69 (2d Cir. 2015) (quoting *Licci*, 732 F.3d at 170)). Additionally, the *Fuld* Court noted that "the prospect remains that the Fifth Amendment might entail a similar 'inquiry into the reasonableness of the assertion of jurisdiction in the particular case.'" *Fuld*, 606 U.S. at 23.

Defendant Ji argues that exercising jurisdiction over him in this case would be unreasonable, Dkt. 47, at 11, and would be inconsistent with the Due Process Clause of the Fifth Amendment, Dkt. 52, Rep. Mem. in Supp. of Def.'s M.T.D. Am. Compl., at 6. Specifically, Ji argues (1) that there is no personal jurisdiction over him as an individual, and (2) that BKEX's alleged contacts with the United States cannot be used to assert personal jurisdiction over Ji in his capacity as a corporate officer. Dkt. 47, at 13–18.

For the reasons set forth below, the Court concludes that plaintiffs have not adequately alleged that Ji, in his personal capacity or his capacity as a corporate officer for BKEX, had sufficient contacts with the United States as a whole such that exercising personal jurisdiction over him is both constitutional and reasonable. For the reasons below, the Court finds that it lacks personal jurisdiction over Defendant Ji, and the motion to dismiss for want of personal jurisdiction is GRANTED.

We start from the proposition that Plaintiffs do not allege that Ji has any personal contacts with the United States other than contacts arising from his corporate capacity. Ji is not alleged ever to have been present in the United States; he has no residence here, no bank accounts, no assets of which the court is aware. Ji argues that the Amended Complaint does not plead facts that would confer jurisdiction on the Court because the factual allegations do not include "any personal act taken by Ji within, or even directed at, the United States." Dkt. 47, at 15.

Plaintiffs, however, assert that Ji did engage in purposeful, directed activity into the United States because, in his capacity as the controlling person behind BKEX, he "personally authorized, directed, approved, and/or ratified BKEX's strategy of cultivating U.S. credibility and U.S. customers," and "directed or ratified the very U.S.-targeted strategy used to attract deposits into the fraudulent custody system at issue." Dkt. 30, ¶¶ 43–44. Plaintiffs further allege that, "[a]s BKEX's founder, chief executive, and controlling person, Ji exercised authority over the exchange's custody systems, customer-deposit model, wallet operations, internal asset movements, and public representations regarding custody, withdrawals, and recoverability," all of which is explicitly contingent on his position within BKEX. Finally, Plaintiffs allege that Ji "personally . . . benefited from BKEX's deliberate cultivation of the United States market and its solicitation of U.S. customers." Dkt. 30, ¶ 45.

All of this sounds like it should be sufficient to confer jurisdiction over Ji. But it is well settled that mere status as a corporate officer is not sufficient to confer jurisdiction over an individual who has not purposefully availed himself of access to the United States. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945). It is equally well settled that, in *Calder v. Jones*, 465 U.S. 783 (1984), the Supreme Court "reject[ed] the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity." *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 n.13 (1984). After all, corporations cannot act except through their employees, officers and directors: it makes little sense to hold that a United States court can exercise jurisdiction over a corporation but not the puppeteers who pull its strings. And in an era where corporations operate internationally, and are able to direct activity from abroad, one would think that the allegations of the complaint were enough to survive a motion to dismiss.

Nonetheless, "jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employes him . . . ." *Keeton*, 465 U.S at 781 n.13; *see Calder*, 465 U.S. at 790. Rather, the issue of personal jurisdiction must be assessed as to each defendant separately, and a plaintiff must plausibly allege facts tending to show that a foreign national who served as an officer or director of a corporation – even of a corporation over which personal jurisdiction is clear – "expressly aimed" *his own individual conduct* at the United States. *See Calder*, 465 U.S. at 789; *Walden v. Fiore*, 571 U.S. 277, 282 (2024).

There are plenty of cases in which conduct that took place entirely outside of a jurisdiction was sufficient to warrant exercising jurisdiction over an individual because of the effects that the individual's actions had in the jurisdiction where suit was filed. For example, in *Calder*, 465 U.S. at 785–86, the Supreme Court considered whether the California Superior Court had personal jurisdiction over two individuals, both of whom were Florida citizens, who were involved in the publication of a defamatory article about the actress Shirley Jones, a California resident. The article was published by the defendants' employer, the National Enquirer, a Florida corporation with its principal place of business in Florida but significant circulation in California. *Id.* at 785–86. Calder, a Florida resident, was the president and editor of the Enquirer, who "overs[aw] just about every function of the Enquirer." *Id.* at 786. Although he did not personally write or conduct research for the article, he had reviewed, approved, and edited the article at issue, and he was the person who declined to print a retraction when one was requested by Jones. *Id.* He had been to California but two times, and neither visit was related to Jones' claims. *Id.* He had no other relevant connections to California. *Id.* Any actions the Calder personally took in connection with the publication of the Jones story thus took place outside of California.

Nonetheless, the Supreme Court concluded that California had personal jurisdiction over Calder. "The fact that the actions causing the effects in California were performed outside the State did not prevent the State from asserting jurisdiction over a cause of action arising out of those effects." *Id.* at 787, 787 n.6. Although Calder argued that he was not responsible for the circulation of the article in California, and that he had no ability to control the Enquirer's marketing activity, the Supreme Court noted that his status as an employee "does not somehow insulate [him] from jurisdiction." *Id.* at 790. Calder "edited an article that [he] knew would have a potentially devastating impact upon respondent" and "that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the *National Enquirer* has its largest circulation." *Id.* at 784. This supported a finding that Calder must "reasonably anticipate being haled into court there." *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Ultimately, the Court found that personal jurisdiction was proper because Calder was a "primary participant[] in the alleged wrongdoing intentionally directed at a California resident . . . ." *Id.* Significantly, jurisdiction was predicated on specific and identifiable actions allegedly taken by Calder (reviewing and approving the subject of the article, editing the story, refusing to print the disclaimer) that had an impact – an "effect" – in California. His contacts were not "judged according to [his] employer's activities there." *Id.* at 790.

The Second Circuit summarized the "*Calder* effects test" in *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013):

> The effects test is a theory of personal jurisdiction typically invoked where . . . the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff. In such circumstances, the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum. *See Calder*, 465 U.S. at 789 . . . .

Obviously, *Calder* involved a dispute between citizens of two different states – not foreign nationals. However, the *Calder* "effects" test is not limited to domestic lawsuits; the test is used to decide whether foreign nationals (including foreign corporations) served under Rule 4(k) can expect to be haled into court in the United States because of their conduct, even if that conduct was committed in another country.

As one might expect, on their facts there are cases going both ways – some holding that personal jurisdiction is lacking over the foreign individual, others holding that exercising jurisdiction is appropriate. *See, e.g., AmTrust Fin. Servs., Inc. v. Lacchini*, 260 F. Supp. 3d 316, 330, 332–33 (S.D.N.Y. 2017) (granting motion to dismiss for lack of personal jurisdiction over Lacchini, an Italian citizen who had no contacts with the United States, for presiding over a rigged arbitration in Italy; "AmTrust's allegations fail to support that Lacchini expressly directed his conduct at the United States, even if the financial effect . . . might foreseeably have been felt by AmTrust in [the United States]"); *TAGC Mgmt., LLC v. Lehman*, No. 10-cv-6563, 2011 WL 3796350, at *6–7 (S.D.N.Y. Aug. 24, 2011) (finding no jurisdiction over Chinese resident who sent email and a letter to U.S. plaintiffs, even where the effects were felt in the United States, because the conduct "in defendants' purported scheme[] occurred only in China, not in the United States"). *Contra In re Aluminum Warehousing Antitrust Litig.*, No. 15-cv-8307, 2020 WL 2036716, at *2–7, 9–15 (S.D.N.Y. Apr. 28, 2020) (denying motion to dismiss for lack of personal jurisdiction over two foreign corporations affiliated with U.S. where actions allegedly taken in Europe affected aluminum prices in the global market, including the United States).

There is absolutely no question that the corporation BKEX has considerable contact with the United States as a whole. Its alleged business model is directed to, *inter alia*, U.S. consumers; indeed, it is a Money Services Business registered with the U.S. Department of

Treasury's Financial Crimes Enforcement Network ("FinCEN"). Dkt. 30, ¶ 31(a). FinCEN registration is required for money transmitting and services businesses *operating in the United States* and imposes compliance and reporting obligations. 31 C.F.R. 1010.100(ff), 1022.380(a) (2026); 31 U.S.C. § 5330(a), (d); *see Ventoso v. Shihara*, 19-cv-3589, 2019 U.S. Dist. LEXIS 107101, at *2 (S.D.N.Y. June 26, 2019). That being so, BKEX's alleged FinCEN registration – an allegation presumed to be true at the pleading stage – demonstrates that the corporation was operating in the United States. 31 C.F.R. 1022.380(a)(2) (2026). Its registration with the Treasury Department – reinforced by the corporation's "[p]ublishing and disseminating English-language promotional content invoking U.S. regulatory and operational connections," Dkt. 30, ¶ 31 – is sufficient, without more, to warrant the conclusion that this court could exercise personal jurisdiction over BKEX. The other allegations of BKEX's purposeful corporate activity in the United States, including:

(1) the operation of an interactive website over which trades/purchases were made from the United States and confirmation of deposits and trades were made available. *See* Dkt. 30, ¶¶ 31(i), 35, 111, 130–133;

(2) the use of social media available to U.S. users to attract U.S. customers. *See* Dkt. 30, ¶¶ 31(g), 94–95;

(3) appearances at U.S. trade shows and conferences. *See* Dkt. 30, ¶¶ 31(d), 93;

(4) holding itself out as maintaining a team presence in San Francisco, possibly through an affiliated entity known as BKEX Labs. Dkt. 30, ¶¶ 6, 31(e), 90–91[1] –

are simply icing on the jurisdictional cake where the corporation is concerned.

But Ji is correct that the pleading must plausibly allege facts from which one could infer that he, Ji – not BKEX – undertook activity that was purposefully aimed at the United States.

[1] BKEX Labs is not a defendant in this case, and Plaintiffs do not allege what BKEX Labs' formal relationship was to BKEX, but it is notable that they do not rely on the existence of BKEK Labs alone to establish that BKEX had a meaningful relationship with and presence within the United States.

This, as it turns out, is often exceptionally difficult for a Plaintiff to do; it bears noting that, in many cases applying the *Calder* effects test to individuals affiliated with non-U.S. corporations, the court ends up deciding that the allegations in the pleading are insufficient to subject individual defendants to personal jurisdiction in the United States.

The allegations against Ji are – like the allegations in many cases where jurisdiction has been found wanting – largely conclusory. Aside from the allegation that Ji was the founder and controlling person over BKEX, they are the sort of allegations that could be made of any director of a corporation. *See Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 802 (S.D.N.Y. 2018) (quoting *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 467 (S.D.N.Y. 2008)). I repeat the obvious fact that a corporation cannot take any action except through its officers, directors and employees. That being so, the fact that it may not be possible to sue said individuals – even if the corporation whose actions they control directed activity into the United States – seems counterintuitive (if not ridiculous). But the rule seems to be clear: a complaint must allege that a foreign national sought to be sued in a United States court for his corporate activity personally took actions that were directed toward this country. It is simply not enough that, because of his status in the corporation, Ji necessarily had to approve those actions.

The cases that articulate this rule are the very ones on which Plaintiffs rely to establish that this court can exercise personal jurisdiction over Ji. But Plaintiffs reach the wrong conclusion.

In *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786 (S.D.N.Y. 2018), the complaint alleged securities fraud in violation of Sections 10(b) and 20(a) of the Exchange Act against Rio Tinto PLC, a U.K. corporation with American Depository Receipts listed on the New York Stock Exchange, and several of the corporation's non-U.S. national officers/directors. Amended Class

Action Complaint at 4, *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786 (S.D.N.Y. 2018) (No. 16-cv-09572), Dkt. No. 40. Two individual officers – Walsh and Davies – moved to dismiss for lack of personal jurisdiction, arguing that any actions they took vis a vis the activities of Rio Tinto PLC were taken outside of the United States. *Das*, 332 F. Supp. 3d at 801–02.

The court concluded that it had personal jurisdiction over Walsh, because Walsh had signed the SEC filing that contained the allegedly misleading information that was the essence of the alleged fraud. *Id.* at 801–02. "Numerous cases hold[] that minimum contacts are satisfied where an individual exercised control over or signed fraudulent SEC statements." *Id.* at 801.

However, the court in *Das* concluded that it did not have personal jurisdiction over Davies, the former chief executive of the Energy & Minerals Group and member of the Executive Committee during the class period – even though Davies (exactly like Ji in our case) was alleged to have played a leadership role in the bribery scheme and misrepresentations at issue. *Id.* In particular, Davies allegedly had accountability over the project for which the bribe was paid, and leaked emails allegedly showed his direct participation in the internal bribery discussions. Amended Class Action Complaint at 55, *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786 (S.D.N.Y. 2018) (No. 16-cv-09572), Dkt. No. 40. Davies was also a member of Rio Tinto's ethics committee, through which he oversaw the drafting of Rio Tinto's code of ethics and conduct. *Id.* However, all of those activities took place in the United Kingdom, and Davies was not alleged to have prepared or signed the relevant United States regulatory filings that were alleged to be false. *Das*, 332 F. Supp. 3d at 801–02. The court declined to exercise personal jurisdiction over Davies because the allegations against him were "merely conclusory statements applicable to all individual defendants as a result of their positions with the company." *Id.* at 802.

In a case brought against a foreign national under the very statute here at issue – the CEA – the facts that justified exercising personal jurisdiction over a foreign national were far stronger than the facts that subjected Walsh to personal jurisdiction in *Das.* In *Messieh v. HDR Global Trading Ltd.*, No. 20-cv-3232, 2024 WL 1514639 (S.D.N.Y. Apr. 3, 2024), the plaintiffs sought to establish personal jurisdiction over Delo, a British citizen. *United States v. Hayes et al.*, No. 20-cr-500 (S.D.N.Y. Feb. 12, 2021), Dkt. 26. Delo was alleged to be co-founder of a corporation (ABS) that was intertwined with BitMEX, a large crypto-asset exchanged that was defrauding investors. ABS was allegedly engaged in marketing which induced U.S. customers to invest in BitMEX, and Delo allegedly derived a personal benefit from the fraudulent activity that allegedly violated the CEA. *Id.* at *2–3.

The court ultimately concluded that it could assert personal jurisdiction over Delo. But that finding was not predicated on his receipt of benefits from the fraud. Rather, the court concluded that there was personal jurisdiction over Delo because Delo's company, ABS, "[was] a U.S. based company, founded in Delaware, conducting business in New York and California," with systems located in New York and specific instances of solicitation of customers in New York. *Id.* at *3. Additionally, Delo "actually came to New York, posting up next to a Lamborghini to draw the attention of U.S. customers, inducing them to invest in BitMEX." *Id.* These were the facts that supported the court's finding that Delo "purposely availed himself of the benefits of the forum – the United States." *Id.* Notably, some of the contacts the court highlighted were things that Delo did as part of his corporate duties. *Id.* at *2–4.

The allegations against Ji in the Amended Complaint are not quite so weak as the allegations against Davies in *Das*, but neither are they as strong as the allegations against Walsh in *Das* or Delo in *Messiah.* The pleading alleges that Ji "personally controlled, or directed the use

of, a Binance account implicated in BKEX's customer-deposit routing system" and that "he was plausibly connected to the infrastructure through which BKEX customer assets were moved and concealed." Dkt. 30, ¶ 70. They also allege that Ji "founded, promoted, controlled, and operated BKEX and exercised authority over the precise functions giving rise to Plaintiffs' claims," and that "Ji directed or ratified BKEX's" U.S.-facing conduct, domestic operational claims, and use of FinCEN registration. Dkt. 51, at 13 (citing Dkt. 30, ¶¶ 19, 36–45, 73–98).

These allegations against Ji do not rise to the level of having signed SEC filings, which were the sole and exclusive basis for exercising personal jurisdiction over Walsh in *Das. Das*, 332 F. Supp. 3d at 801. Nor is Ji alleged to be affiliated with a U.S. corporation, or to have traveled to the United States, as Delo did in *Messieh*, 2024 WL 1514639, at *3. The Amended Complaint does not allege that Ji personally took any of the actions that subject BKEX – a British Virgin Islands corporation – to personal jurisdiction in the United States, which appears to be the necessary predicate to the exercise of personal jurisdiction over a corporate officer or director who otherwise has no personal contacts with the United States. It only alleges that he "ratified" those actions – something that would be expected of any corporate director.

Of particular significance, Ji is not alleged to have personally registered the corporation with the United States Treasury as a Money Services Business. Ji is not even alleged to have ordered anyone else to do so. He is alleged to have controlled and had access to a wallet that received cryptocurrency diverted as part of the alleged scheme, but he is not alleged to have personally pocketed any of the money that was transmitted to BKEX from the United States – and it is significant that a similar allegation was held insufficient to confer jurisdiction over Delo in *Messieh*, 2024 WL 1514639, at *1, 3. While the pleading alleges that some of the allegedly stolen customer funds were solicited by BKEX through the company's U.S.-facing strategy, there

is no allegation that Ji, as an individual. targeted U.S. individuals' accounts; rather, the allegation is that BKEX did so, and that Ji. BKEX's founder and leader, directed or approved that activity from abroad. That is precisely the type of generalized formal corporate activity that has been repeatedly held not to confer jurisdiction over a foreign national acting from abroad. *See Walden v. Fiore*, 571 U.S. 277, 286, 289 (2014) (holding that the "proper lens" for assessing a defendant's contacts is "whether the *defendant's* actions connect him to the *forum*," and that "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction").

Plaintiffs argue that they are not relying simply on Ji's affiliation with BKEX, but rather on the fact that he was a – or the control person over that corporation and all of its activities. Dkt. 30, ¶¶ 73–83; Dkt. 51, at 13. They are, in effect, asserting that Ji is the "primary actor" under the "primary actor standard," which is the standard applied to determine whether long arm jurisdiction attaches to a corporate officer or director under New York (not federal) law. N.Y. C.P.L.R. § 302. Under the primary actor standard,

> In cases involving corporate officers, personal jurisdiction over the corporation for a tortious act does not necessarily grant jurisdiction over its employees; in order to show jurisdiction over an out-of-state officer for a corporation's actions [within the forum], a plaintiff must show that the officer is a "primary actor[] in the transaction" and not merely "some corporate employee . . . who played no part" in the allegedly tortious act.

*Vista Food Exch., Inc. v. Champion Foodservice, LLC*, 124 F. Supp. 3d 301, 308 (S.D.N.Y. 2015) (second and third alterations in original) (quoting *Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988)) (applying the primary actor standard in a case involving N.Y. C.P.L.R. § 302(a)(3)). The inquiry is whether the corporate employee was a primary actor in the company's transactions in the forum that gave rise to the litigation. *FTC v. Quincy Bioscience Holding Co.*, 17 Civ. 124, 2022 WL 2440421, at *1 (S.D.N.Y. July 5, 2022) ("The undisputed

facts show that Mr. Underwood is not domiciled in New York, and does not personally have continuous or permanent contacts with New York. The question is therefore whether through his role as President, co-founder and board member of defendant corporation Quincy Bioscience Holding Company, Inc., Mr. Underwood was a primary actor in Quincy's transactions in New York that gave rise to the litigation."); *see also Messieh v. HDR Global Trading United Ltd.*, 20-cv-3232, 2024 WL 1514639 (S.D.N.Y. Apr. 3, 2024) (noting that Delo was "central" to the manipulative efforts underlying plaintiffs' claims).

In *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 254 n.14 (2d Cir. 2007), the Second Circuit has analogized the primary actor test to the *Calder* test, stating that, "New York courts would evaluate personal jurisdiction asserted on the basis of allegedly tortious conduct committed outside the state and targeted at alleged New York victims under section 302(a)(3). And Section 302(a)(3) . . . is roughly analogous to the 'effects test' in *Calder* . . . ." Several cases have applied the primary actor test to personal jurisdiction analysis under § 302(a)(3). *See, e.g.*, *Brownstone Inv. Grp. LLC v Bonner & Partners, LLC*, 20-cv-7351, 2021 WL 3423253, at *4 (S.D.N.Y. Aug. 5, 2021); *Vista Food Exch., Inc.*, 124 F. Supp. 3d at 307–08.

Although Plaintiffs do not specifically mention the primary actor standard in their motion papers, the allegations about Ji – including specifically that he "personally controlled, or directed the use of, a Binance account implicated in BKEX's customer-deposit routing system," Dkt. 30, ¶ 70, and played a "central role" and was a "principal operator" in BKEX's criminal operations, which was directed at the United States, Dkt. 30, ¶¶ 72, 202, 209, 249, 311–12 – are the sort of allegations that are common in cases where courts apply the primary actor test. It is a test that looks at whether "the defendants were the 'primary participants in an alleged wrongdoing intentionally directed at' the forum state, that the defendants knew that their conduct would

impact the forum state, and that they knew they might reasonably be haled into court here to account for their actions." *Newmont Mining Corp. v. AngloGold Ashanti Ltd.*, 344 F. Supp. 3d 724, 742–43 (S.D.N.Y. 2018) (quoting *Calder*, 465 U.S. at 790). The Amended Complaint even alleges that Ji was the subject of criminal proceedings in China (from which he is presently a fugitive), where he was found to be a "primary participant" in BKEX's fraudulent operations and its misrepresentations regarding the custody of customer assets. That is, of course, precisely the same sort of conduct alleged against Ji and BKEX in this case (e.g., removing customer assets from the platform before or in connection with the withdrawal freeze). Dkt. 30, ¶¶ 7, 72, 202, 209, 219–20.

Nonetheless, the cases on which Ji relies to argue against the exercise of personal jurisdiction are persuasive. For example, Ji cites *In re Aegean Marine Petroleum*, 529 F. Supp. 3d 111, 123, 135–39 (S.D.N.Y. 2021), to support his argument that the Court lacks personal jurisdiction over a CEO who allegedly acted as the driving force behind a fraudulent scheme, but who did so from abroad. Dkt. 47, at 17. The plaintiffs in *Aegean* alleged that the founder and former CEO of Aegean, Melissanidis, engaged in fraud and misappropriation of Aegean assets, and that the corporation Aegean Marine made false and misleading filings with the SEC that failed to disclose his misconduct, in violation of the Securities Exchange Act of 1934. The court found that Melissanidis' conduct in embezzling funds failed to establish personal jurisdiction in the securities fraud case that was pleaded because "those actions were entirely outside of the United States." *Aegean*, 529 F. Supp. 3d at 137 (noting that "Aegean is a Marshall Islands entity headquartered in Greece;" OilTank, the principal beneficiary of Aegean's misappropriation, "is a Marshall Islands entity headquartered in Fujairah[;] and the Fraudulent Scheme arose in connection with the Facility, which is located in the UAE"). Particularly relevant was the court's

finding that the complaint did not allege that Melissanidis prepared any of the fraudulent SEC filings at issue, which was an element of many of the alleged Securities Exchange Act violations. *Id.* at 136.

Several cases have also found that routing funds through the United States is insufficient to confer personal jurisdiction over foreign defendants who were allegedly perpetrating a fraud from abroad. *See, e.g.*, *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 590 (S.D.N.Y. 2017) (finding, in reviewing personal jurisdiction over corporate defendants, that manipulation through electronic communications that happened to route through U.S. servers was not enough to find sufficient contacts with the U.S., and that "[t]here is no basis to conclude that any of the [defendants] . . . took actions 'expressly aimed' at the United States by passively connecting to the United States via internet protocol ('IP') addresses" (quoting *Laydon v. Mizuho Bank, Ltd*, 12 Civ. 3419, 2015 WL 1515358, at *3 (S.D.N.Y. Mar. 31, 2015) (second and third alterations in original))); *Laydon*, 2015 WL 1515358, at *3. These cases found that a plaintiff's communications from the United States to a foreign defendant over the Internet did not satisfy the due process requirements from *Walden*. *Walden*, 571 U.S. at 285–86 (requiring "a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." (quoting *Burger King*, 471 U.S. at 475)).

It is true that the jurisdictional facts in *Aegean*, *Sonterra*, and *Laydon* are particularly weak. The court in *Sonterra* and *Laydon* noted that the foreign corporation defendants only "passively connect[ed] to the United States via internet protocol ('IP') addresses" when they engaged in their allegedly fraudulent and manipulative conduct through Bloomberg and other third-party services. *Laydon*. 2015 WL 1515358, at *3; *Sonterra Cap. Master Fund Ltd.*, 277 F.

Supp. 3d at 578, 590. In *Aegean*. Melissanidis' only relevant contact with the United States was the fact that his company was publicly traded on the NYSE. *Aegean*, 529 F. Supp. 3d at 137. In our case, the contacts between BKEX and the United States were not so minimal – the company was, after all, allegedly registered to do business as a Money Services Business in this country – and they are alleged to have been anything but passive. Funds were embezzled directly from individual accounts, including those belonging to U.S.-based account holders who engaged in business with BKEX through its website, which was accessible in the United States. *See Hsi Ten Enter. U.S. v. Clark Enters.*, 138 F. Supp. 2d 449, 456 (S.D.N.Y. 2000) (finding support for personal jurisdiction through Internet activity in the forum where a defendant uses an interactive website which permits the exchange of information or has a website through which the defendant clearly does business over the Internet, as applied to find personal jurisdiction in New York over Clark Enterprises, a Kansas corporation, in a trademark infringement claim seeking jurisdiction under the New York long-arm statute).

Also, the court in *Aegean* concluded that it had personal jurisdiction over Melissanidis, on one of the claims asserted against him – for insider trading relating to his repurchase of over twenty percent of outstanding Aegean shares – and did so by applying the *Calder* effects test to the defendant's non-U.S. conduct. *Aegean*, 529 F. Supp. 3d at 138–40, 142–43. Because "Aegean stock traded only on the NYSE and Aegean's transfer agent was located in Colorado," the repurchase created a "near certainty that United States shareholders . . . would be adversely affected" by the former CEO's actions. *Id.* at 139–40 ("Even though there was no direct United States shareholder on the other side of the transaction, the Repurchase inevitably affected United States shareholders. In such circumstances, Melissanidis should have 'reasonably anticipate[d]

being haled into an American court.'" (quoting *SEC v. Euro Sec. Fund*, No. 98 Civ. 7347, 1999 WL 76801, at *3 (S.D.N.Y. Feb. 17, 1999)) (citations omitted)).[2]

In this case, the alleged fraudulent routing scheme created a near certainty that U.S. users of BKEX would be adversely impacted. However, the facts on which Plaintiffs rely to establish jurisdiction over Defendant Ji were either conducted outside the United States, or are actions that are better attributed to BKEX, not to Ji. BKEX is not a U.S. company. Defendant Ji is not alleged to have ever travelled to the United States, or to have personally signed or filed misleading statements with any regulatory agency in the United States. The Amended Complaint does not include sufficient allegations to support a finding that Ji, in his personal capacity – as opposed to BKEX – targeted U.S. individuals and their accounts or pocketed their money.

Therefore, the Court concludes that the allegations in the Amended Complaint are insufficient to warrant a finding that Ji is subject to personal jurisdiction here.

I do not find this a comfortable result. It is, in fact, a naive and outdated way of looking at personal jurisdiction in a wired world, where foreign individuals, especially when acting through corporations, can easily work harm to United States citizens and interests – even harms that may violate United States law – without subjecting themselves to suit in this country, simply because they are able to remain abroad and refrain from direct dealings with U.S. consumers or the government.

(3) <u>The Exercise of Personal Jurisdiction over Ji Would Have Been Reasonable.</u>

Because I have concluded that the allegations of the Amended Complaint are insufficient to establish personal jurisdiction over Defendant Ji, the Court need not analyze whether such an exercise of jurisdiction over Ji would be reasonable – even "assuming that *Fuld* leaves room for

[2] The court in *Aegean* did not explore the possibility of exercising supplemental jurisdiction over Melissanidis on the securities fraud claims (discussed *supra*, pp. 27–29), given that the court had jurisdiction over the repurchase claims.

a separate inquiry into 'the reasonableness of the assertion of the jurisdiction in the particular case.'" *Fuld*, 606 U.S. at 23; *AmTrust Fin. Servs., Inc. v. Lacchini*, 260 F. Supp. 3d 316, 329 (S.D.N.Y. 2017) (noting that because defendant Lacchini did not have minimum contacts, the court had no occasion to review the reasonableness prong of the personal jurisdiction due process inquiry). I will, however, address this issue, in case a higher court should disagree with my conclusion that the Amended Complaint fails to allege fact establishing personal jurisdiction over Ji.

On the facts alleged, it would be reasonable to exercise jurisdiction over Ji:

> The reasonableness inquiry requires courts to decide whether asserting personal jurisdiction over the defendant comports with "traditional notions of fair play and substantial justice." Relevant factors include (1) the burden the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Messieh*, 2024 WL 1514639, at *3 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011)) (citations omitted) (citation modified); *see also Burger King*, 471 U.S. at 477 (outlining these five factors in the reasonableness inquiry). "[T]he defendant bears the burden of demonstrating that the assertion of jurisdiction in the forum will 'make litigation so gravely difficult and inconvenient that [he] unfairly is at a severe disadvantage in comparison to his opponent.'" *Messieh*, 2024 WL 1514639, at *3 (quoting *Burger King*, 471 U.S. at 478) (alteration in original).

First, Defendant Ji made no particular showing that the burden on him would be "severe" or "gravely difficult." Dkt. 47, at 18–19; *see SEC v. Straub*, 921 F. Supp. 2d 244, 259 (S.D.N.Y. 2013); *SEC v. Passos*, 760 F. Supp. 3d 95, 113 (S.D.N.Y. 2014) (finding no reasonableness barrier where the noncitizen defendant spoke little English, lived abroad, and had no ties to the

United States, because "'the conveniences of modern communication and transportation' ease whatever burdens Defendant's native language and residence might have presented decades ago" (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129–30 (2d Cir. 2002))). Second, because this claim arises under a federal law, "the United States has a strong interest in providing injured parties with relief from alleged violations of its laws." *In re N. Sea Brent Crude Oil Futures Litig.*, 13-md-02475, 2017 WL 2535731, at *12 (S.D.N.Y. June 8, 2017); *see Orient Plus*, 808 F. Supp. 3d at 618 ("It is also well established that 'the United States has a substantial interest in the enforcement of its securities laws and protection of investors in United States securities markets.'" (quoting *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 479 (S.D.N.Y. 2001))); *Fuld*, 606 U.S. at 24 (citing *Ford Motor Co. v. Mont. 8th Jud. Dist. Ct.*, 592 U.S. 351, 368 (2021), for the proposition that a forum state has a significant interest in "providing [their] residents with a convenient forum for redressing injuries inflicted by out-of-state actors" (alteration in original)). It is unquestionable that the corporate defendants BKEX is subject to United States jurisdiction for the conduct alleged in the complaint, and the courts of another country have found Ji to have been a "primary actor" in bringing that conduct about. Third, Plaintiffs have a significant interest in obtaining convenient and effective relief, which is likely to be ineffective since they are not able to bring suit in the United States. Defendant Ji is noted in the complaint as a Chinese fugitive who has not submitted to China's criminal jurisdiction, although a criminal judgment was allegedly entered against him in China. Dkt. 30, ¶¶ 202, 219–20. Additionally, Plaintiffs find this forum convenient because another defendant in this claim, Aux Cayes Fintech Co. Ltd., d/b/a "OKX" and formerly d/b/a "OKEx," pleaded guilty in this jurisdiction to an unlicensed money transmitting business relating to conduct that directly overlaps with the period under Defendant Ji allegedly used OKX-linked accounts for processing

of cryptocurrency from BKEX customers om connection with the alleged routing scheme. Dkt. 30 ¶¶ 55–57. Finally, Defendants do not take issue with directly with factors (4) and (5) above. However, as noted, there are strong federal interests involved in cases involving a federal question. *Orient Plus*, 808 F. Supp. 3d at 617–18. Therefore, although it might not have been convenient for Defendant Ji to defend this action in the United States, he did not make a showing that the burden of litigating this case in the S.D.N.Y. would be unreasonable. *See Messieh*, 2024 WL 1514639, at *3.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Because the court lacks personal jurisdiction over Ji, it is not necessary to address the alternative grounds he proffers for why the complaint should be dismissed – that the claims against him fail to state a cause of action because (1) they are impermissibly extraterritorial, and (2) they run afoul of the statute of limitations. However, in an effort to conserve judicial resources, I choose to address these matters now – since, taken collectively, they provide an alternative ground for dismissing this lawsuit altogether. Specifically, Mou's claims must be dismissed as impermissibly extraterritorial, and Hanson's claims (as well as the class allegations) must be dismissed on statute of limitations grounds. Finally, the court would decline to exercise supplemental jurisdiction to entertain the state law claims.

## II. The Motion to Dismiss Mou's CEA Claims as Impermissibly Extraterritorial Should Be Granted; The Motion to Dismiss Hanson's CEA Claims Should be Denied

Defendant Ji moves in the alternative to dismiss the claims against him for failure to state a claim on which relief can be granted. He argues that the plain language of the CEA does not

encompass conduct relating to cryptocurrency exchange, and that Plaintiffs' claims are impermissibly extraterritorial, in violation of the right of action provided under the CEA.

This action is brought under 7 U.S.C. §§ 9(1), 25(a)(1), and 17 C.F.R. § 180.1 (2026). 7 U.S.C. § 25 gives Plaintiffs a private right of action to sue for violations of the substantive provisions of the CEA, including § 9(1). *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 101 (2d Cir. 2019). In particular, § 25(a)(1) provides that "'[a]ny person . . . who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting' from one of four types of violations, including, as relevant here," *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 111 (2d Cir. 2018), "the contract of sale of any commodity for future delivery (or option on such contract or any commodity) or any swap; or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with such contract or any swap," 7 U.S.C. § 25(a)(1)(B). While Ji cites cases from district courts in California, Texas, and Arizona to argue that the CEA does not apply to cryptocurrency exchanges, in this court and others the opposite conclusion was reached. *United States v. Reed*, 20-cr-500, 2022 WL 597180, at *4 (S.D.N.Y. Feb. 28, 2022) ("[U]nder the plain language of the CEA, cryptocurrencies fall within the definition of commodities. *See CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 496–98 (D. Mass. 2018). This plain language is buttressed by a core characteristic that cryptocurrencies share with other commodities whose derivatives are regulated by the CFTC – namely, that they are 'exchanged in a market for a uniform quality and value.' *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y. 2018), *adhered to on denial of reconsideration*, 321 F. Supp. 3d 366 (E.D.N.Y. 2018)."); *accord CFTC v. Alexandre*, 22-cv-3822, 2024 WL 3361111, at *4 (S.D.N.Y.

July 10, 2024); *United States v. Mashinsky*, 23-cr-347, 2024 WL 4728500, at *3 (S.D.N.Y. Nov. 8, 2024).

And so I turn to the issue of extraterritoriality. 7 U.S.C. § 9(1) provides a right of action for damages resulting from "any contract of sale of any commodity for future delivery (or option on such contract or any commodity or any swap; or who deposited with or paid to such person money, securities, or property . . . in connection with any order to make such contract or any swap." Finally, 17 C.F.R. § 180.1(a) is a CFTC rule that makes it unlawful for any person to employ manipulative and deceptive devices, including making misleading statements of material fact, engaging in acts which would operate as a fraud on another person, or delivering communications with false, misleading, or inaccurate reports about information that would effect interstate commodity pricing. Aside from mentions of interstate commerce, these sections do not provide for worldwide service of process or otherwise mention extraterritorial effect.

"Courts must presume a statute lacks extraterritorial effect 'unless there is the affirmative intention of the Congress clearly expressed.'" *Loginovskaya v. Batratchenko*, 764 F.3d 266, 271 (2d Cir. 2014) (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 246, 255 (2010)). The Second Circuit has squarely held that Sections 9 and 25 do not apply extraterritorially – a holding this court is bound to follow. *Loginovskaya*, 764 F.3d at 271–72 (noting that 7 U.S.C. § 25(a) "is silent as to extraterritorial reach"); *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 266–67 (2d Cir. 2023) (holding that 7 U.S.C. § 9 does not apply extraterritorially (citing *Prime Int'l*, 937 F.3d at 102–03)). Additionally, 17 C.F.R. § 180.1 was also found not to apply extraterritorially in *CFTC v. Gorman*, 21 Civ. 870, 2023 WL 2632111, at *9–10 (S.D.N.Y. Mar. 24, 2023).

Since the statutes that this case is brought under do not apply extraterritorially, the next step is to "determine whether the case involves a domestic application of the statute." *Prime Int'l*, 937 F.3d at 104 (quoting *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 326 (2016)). "[I]n order for Plaintiffs to state a proper domestic application of [7 U.S.C. § 25], the suit 'must be based on transactions occurring in the territory of the United States,'" *id.* (quoting *Loginovskaya*, 764 F.3d at 272), and "must also allege a violation of one of the CEA's substantive provisions," *id.* at 105. "[T]he extraterritoriality analysis under the CEA has two parts: at step one the Court must determine whether the plaintiff's claim involves a 'domestic transaction.' Assuming this requirement is satisfied, the Court must proceed to step two and consider whether the claims are 'so predominantly foreign as to be impermissibly extraterritorial.'" *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 915–16 (S.D.N.Y. 2018) (quoting *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014)).

1. Domestic Transactions Test

The Second Circuit has identified two ways to allege a domestic transaction under the CEA, adopting the analysis formulated for securities under the Exchange Act:

> First, "it is sufficient for the plaintiff to allege that title to the [security] was transferred within the United States." Second, a plaintiff may allege facts showing "that the parties incurred irrevocable liability within the United States: that is, that the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security." . . . [Plaintiffs] must therefore demonstrate that the transfer of title or the point of irrevocable liability for such an interest occurred in the United States.

*Loginovskaya*, 764 F.3d at 273–74 (first alteration in original) (quoting *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012)). "[I]rrevocable liability attaches 'when the parties to the transaction are committed to one another,' or when 'in the classic

contractual sense, there was a meeting of the minds of the parties.'" Williams, 96 F.4th 129, 136 (2d Cir. 2024) (quoting *Absolute Activist*, 677 F.3d at 68).

a. Attachment of Irrevocable Liability to Plaintiff Hanson's Claim.

Plaintiff Hanson argues that the Amended Complaint shows that parties incurred irrevocable liability when he committed his cryptocurrency to BKEX while he was in California, through a California account, and in exchange received internal account credits reflecting BKEX's acceptance and control of the property. Dkt. 51, at 19 (citing Dkt. 30, ¶¶ 1, 18, 67, 99–108, 130–34, 279–86). Plaintiff also argues that "BKEX's broader United States conduct" supports the conclusion that this was a domestic transaction. Dkt. 51, at 19.

In support of these assertions, Plaintiffs cite *Williams v. Binance*, 96 F.4th 129, 137–40 (2d Cir. 2024), for its holding that "users plausibly alleged domestic cryptocurrency transactions through United States acceptance of platform terms, order activity, and payment." Dkt. 51, at 19. However, Defendant Ji responded that *Williams* provides a stronger set of facts than the instant case. Dkt. 52, at 9–10. In *Williams*, the transactions at issue were matched on U.S.-based servers, meaning that "the matching of Plaintiffs' buy offers with sellers" happened on U.S.-based servers hosting Binance's platform. *Williams*, 96 F.4th at 137. This was further strengthened in *Williams* by the fact that the transaction was governed by U.S. securities laws and Binance expressly disclaimed having any physical location. *Id.* Although Plaintiffs do not make allegations as to the location of BKEX's servers for the purposes of the transfer, Plaintiffs do allege that BKEX "use[d] U.S.-based commercial and digital infrastructure, including registering and maintaining BKEX's primary domain through GoDaddy, a U.S.-based domain registrar." Dkt. 30, ¶ 31(i). Additionally, the transactions at issue are allegedly governed by U.S. laws under the CEA and through BKEX's FinCEN registration. Therefore, Plaintiff Hanson has made a sufficient

showing, for the purposes of this motion to dismiss, that irrevocable liability attached within the United States such that his claims fall within the domestic transactions rule.

b. Plaintiff Mou's Claims Are Impermissibly Extraterritorial.

Plaintiff Mou asserts that the parties incurred irrevocable liability when he transmitted his cryptocurrency to BKEX, and BKEX "accepted, credited, processed, and assumed custody of his deposits." Dkt. 51, at 22–23. He argues that this occurred in the United States because of BKEX's representations about its operations in the United States and FinCEN registration, and that at least some of his assets were processed through a "centralized-exchange infrastructure with substantial United States operations and connections." Dkt. 51, at 23; Dkt. 30, ¶ 129.

Mou resides in Switzerland and is a Chinese citizen, Dkt. 30, ¶ 14, which is a notable difference from Hanson. Plaintiffs point to *Williams v. Binance*, 96 F.4th 129 (2d Cir. 2024), to support their argument that the exchange-side systems and infrastructure is relevant to the location of the transaction, and that irrevocable liability can incur in the United States, even where the transaction involves foreign parties through that infrastructure. Dkt. 51, at 23. But while it is true that the location of the exchange-side systems and infrastructure through which the binding acts occurred is relevant to the domestic transaction test, *see Williams*, 96 F.4th at 138–39, the facts alleged in the Amended Complaint do not support Plaintiffs' position that BKEX's systems and infrastructure for Plaintiff Mou's transactions were predominantly domestic – or were domestic at all. As discussed above, *Williams* involved U.S. plaintiffs, U.S.-based servers carrying out the transaction at issue, and a defendant company that disclaimed having any physical location. *Id.* at 137. By contrast, there are no factual allegations in the complaint to support the conclusion that any part of the transaction between Mou and BKEX occurred in the United States.

The Amended Complaint alleges that BKEX had personnel in San Francisco, Dkt. 30, ¶ 91, and that "at least some of Plaintiff Mou's BKEX-related activity moved through U.S.-linked cryptocurrency exchange infrastructure," Dkt. 30, ¶ 129. However, the focus of the domestic transactions test is on the transaction itself, not "a party's residency or citizenship" or other contacts the company may have with the United States. *Loginovskaya*, 764 F.3d at 274 (quoting *Absolute Activist*, 677 F.3d at 70). Consequently, even if BKEX did have personnel in San Francisco, there are no allegations that its U.S.-based personnel were engaged in Plaintiff Mou's transactions or that the parties attained irrevocable liability in the United States. Further, even if some of Plaintiff Mou's transactions originated from a cryptocurrency exchange that has operations in the United States, there are no allegations that the transactions at issue in this case were routed through the U.S. infrastructure.

Therefore, Mou's transactions in BKEX were not domestic transactions, and his claim is impermissibly extraterritorial. He cannot proceed; his CEA claims must be dismissed.

2. <u>Hanson's CEA Claims Are Not Predominantly Foreign and So Cannot Be Dismissed as Impermissibly Extraterritorial</u>

Even if irrevocable liability attached in the United States to Hanson, the transaction(s) underlying his CEA claims must not be "so predominately foreign as to be impermissibly extraterritorial." *Prime Int'l*, 937 F.3d at 106 (quoting *Parkcentral Glob. HUB Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014)). In determining whether a claim is predominately foreign, courts look to the conduct relevant to the statute's focus, which is "'the object of [the statute's] solicitude,' which can include the conduct it 'seeks to regulate' as well as the parties and interests it 'seeks to protect' or vindicate." *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413–14 (2018) (quoting *Morrison*, 561 U.S. at 267). "[I]f the relevant conduct occurred in another country, 'then the case involves an impermissible extraterritorial

application regardless of any other conduct that occurred in U.S. territory.'" *Id.* at 108 (quoting *WesternGeco*, 585 U.S. at 414). The relevant conduct goes to the focus of a statute. *Prime Int'l*, 937 F.3d at 107.

This claim is brought under 7 U.S.C. §§ 9(1) and 25(a)(1)(B). The Second Circuit has held that § 9(1) "centers on manipulation in commodities markets." The alleged manipulation of the market that occurred here is Defendants' manipulation of BKEX's exchange data and marketing to build legitimacy for the exchange platform to then perpetrate a fraud on its customers by stealing funds and providing false account balances. Dkt. 30, ¶¶ 287–307. Defendant Ji and BKEX conducted the alleged manipulation through BKEX's website, which, as aforementioned, "us[ed] U.S.-based commercial and digital infrastructure, including . . . a U.S.-based domain registrar." Dkt. 30, ¶ 31(i). This alleged marketing and manipulation of BKEX's exchange data was directed at, and directly affected, U.S. users.

Defendant Ji points to *Prime International* to argue that the manipulation came predominantly from abroad and that it only had "ripple effects" in the U.S., which would be insufficient to find a domestic transaction. Dkt. 47, at 22–23 (citing *Prime Int'l*, 937 F.3d 106–108). However, *Prime International*, as well as *Laydon* and *Parkcentral*, are distinguishable. All three of these cases similarly relied on misleading statements made abroad, which harmed the positions of the U.S. plaintiffs who engaged in stock trading on U.S. exchanges based on the false information. *Prime Int'l*, 937 F.3d at 106–07; *Parkcentral*, 763 F.3d at 214–16; *Laydon v. Coöperatieve Rabobank U.A.*, 51 F.4th 476, 486–88 (2d Cir. 2022). By contrast, the Amended Complaint here does not rely on one-sided actions of a U.S. plaintiff purchasing stocks on an exchange. Rather, BKEX and Plaintiff Hanson allegedly engaged in a mutual business transaction, in which BKEX made its U.S. platform available to U.S. consumers; Hanson opened

an account and engaged in transactions in the U.S. through his BKEX account; and BKEX received and credited his account with his domestic deposits – and then allegedly clandestinely routed his funds outside of his account. Dkt. 51, at 21–22. These allegations are a scheme directed at misleading and committing a fraud upon U.S. consumers directly; the harm to U.S. consumers was not merely due to some "ripple effects" in the United States. Therefore, this transaction is not so predominantly foreign as to be impermissibly extraterritorial. *See Prime Int'l*, 937 F.3d at 106 (quoting *Parkcentral*, 763 F.3d at 216).

The motion to dismiss Hanson's claims as impermissibly extraterritorial must, therefore, be denied.

III. Hanson's CEA Claims Are Barred by the Statute of Limitations

Ji also moves to dismiss both Plaintiffs' claims as time-barred. Because Mou's claims have been dismissed as impermissibly extraterritorial, I need only consider this motion insofar as it is addressed to Hanson's claims (and the class on behalf of which he sues).

The motion must be granted.

> "The lapse of a limitations period is an affirmative defense that a defendant must plead and prove." *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008) (citing Fed. R. Civ. P. 8(c)(1)). "However, a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Id.* Of course, affirmative defenses, like the statute of limitations, "often require[] consideration of facts outside of the complaint and thus [are] inappropriate to resolve on a motion to dismiss." Kelly-Brown v. Winfrey, 717 F.3d 295, 308 (2d Cir. 2013). Dismissal under Rule 12(b)(6) is therefore appropriate only if "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015) (internal quotation marks and citation omitted).

*Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 149–50 (2d Cir. 2024) (alterations in original). "[W]here there is even 'some doubt' as to whether dismissal is warranted, a court should not grant a Rule 12(b)(6) motion on statute of limitations grounds." *Parisienne v. Scripps*

*Media, Inc.*, 19-cv-8612, 2021 WL 3668084, at *2 (S.D.N.Y. Aug. 17, 2021) (quoting *PK Music Performance, Inc. v. Timberlake*, 16-cv-1215, 2018 WL 4759737, at *7 (S.D.N.Y. Sep. 30, 2018)). But where it is clear that the limitations period expired prior to the commencement of suit, it is perfectly appropriate to grant a pre-answer motion to dismiss on this ground.

A private right of action brought under the CEA "shall be brought not later than two years after the date the cause of action arises." 7 U.S.C. § 25(c). A CEA claim accrues under the "discovery accrual rule," either through "actual or inquiry notice." *Behrens v. JPMorgan Chase Bank, N.A.*, 2024 WL 1090856, at *1 (2d Cir. 2024) (first quoting *Levy v. BASF Metals Ltd.*, 917 F.3d 106, 109 (2d Cir. 2019), and then quoting *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 151 (2d Cir. 2012)).

A CEA claim accrues through actual notice when the plaintiff discovers his "CEA injury – that is, a loss that was the result of a CEA violation." *Levy*, 917 F.3d at 108–09 (citing favorably *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009), for the proposition that it is "the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim").

Alternatively, a CEA claim can accrue through inquiry notice. "[W]here 'the circumstances known to' a plaintiff, 'as alleged in the complaint, were such as to suggest to a person of ordinary intelligence' that she has been defrauded, 'a duty of inquiry' may arise that commences the CEA's two-year limitations period." *Levy*, 917 F.3d at 109 (quoting *Benfield v. Mocatta Metals Corp.*, 26 F.3d 19, 22 (2d Cir. 1994)). "Inquiry notice is sometimes referred to as 'storm warnings.'" *In re Merrill, Bofa, & Morgan Stanley Spoofing Litig.*, 19-cv-6002, 2021 WL 827190, at *6 (S.D.N.Y. Mar. 4, 2021) (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 168 (2d Cir. 2025)). Once a plaintiff is on inquiry notice,

> [i]f the plaintiff thereupon proceeds to make no inquiry, knowledge of the injury is imputed at the time the duty arose, and the limitations period begins at that point. If, however, the plaintiff makes an inquiry, the limitations period starts to run from the date that a reasonably diligent inquiry should have revealed the fraud.

*Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 474 (S.D.N.Y. 2016) (citations omitted).

Mou – whom we can assume to be a reasonably diligent individual – actually did make inquiries about his frozen funds, and he started making them quite promptly. In June 2023 – when the "temporary" freeze of BKEX accounts had been in effect for just one month – Mou went to the police, seeking information about where his money had gone. If the test for accrual of a claim is when the plaintiff was on actual notice of his loss, it would seem that Mou's claim had accrued by the time that he first went to law enforcement authorities. He may not have known all the elements of his claim, or the names of all the people he might sue – but one does not have to have all of that information in order to trigger the statute of limitations. Nor is the test when there was a "first authoritative public confirmation of BKEX's criminal operations" as a result of the Chinese judgment. No authorities need confirm what a diligent individual who is making inquiries has come to suspect. The test is when a reasonably diligent inquiry should have revealed the fraud.

But since the test for accrual in a case where actual inquiry is alleged is when a reasonably intelligent person would have figured out that he had been defrauded, let us, for purposes of argument, make the (highly dubious) assumption that Mou's now-dismissed claim was timely filed when he commenced his lawsuit in February of 2026. Unfortunately for Hanson, that fact does not save his (or the class's) subsequently filed CEA claims from dismissal on statute of limitations grounds.

Hanson cannot rely on Mou's actions in order to plead a timely claim of his own, because when Mou (whose claims have been dismissed) brought his lawsuit on February 19, 2026, he did so only in his own right. He did not bring his lawsuit as a class representative or purport to sue on behalf of a class of similarly situated persons. The caption of his complaint and the allegations of the pleading make no reference to any class action. Mou sued as an individual, representing only himself. Therefore, the filing of Mou's lawsuit tolled the statute of limitations as to Mou and Mou alone -- not as to anyone else, including Hanson or the members of the putative class.

A class action tolls the statute of limitations for putative members of the class. *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 551–53 (1974); *In re WorldCom Secs. Litig.*, 496 F.3d 245, 247 (2d Cir. 2007) (citing *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983)). But one individual's lawsuit, brought only on behalf of himself and not purporting to be brought on behalf of a putative class, does not toll the statute of limitations for persons who might be similarly situated to the plaintiff. It tolls the statute only for the person who brought the lawsuit. As a result, one cannot, for statute of limitations purposes, "relate back" a subsequently-filed class action to a timely filed lawsuit that was not filed as a class action.

Cases following the Supreme Court's decision in *American Pipe & Construction Co. v. Utah*, 414 U.S. at 551–53, have made this clear. The statute of limitations is not tolled as to a subsequent class action even when the timely filed suit was filed as a class action, but class certification was denied. *See, e.g.*, *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 393 (2d Cir. 2021) ("*American Pipe* does not permit the maintenance of a follow-on class action past expiration of the statute of limitations" so as to permit the filing of a subsequent class action after denial of certification of the class in the initial action (quoting *China Agritech,*

*Inc. v. Resh*. 584 U.S. 732, 736 (2018))). Equally, the filing of a lawsuit on behalf of a class defined with specific parameters does not toll the statute of limitations on behalf of the members of the putative class in a subsequently filed lawsuit where the class in the second suit was not defined in the same manner as the class in the original lawsuit:

> The Second Circuit Court of Appeals has also previously denied an attempt by investors to relate back claims to an earlier class action complaint in which the investors were not defined class members, because doing so "would not accord with one of the rationales of *American Pipe*," namely that "commencement of the class action adequately notifies the defendants . . . 'of the number and generic identities of the potential plaintiffs who may participate in the judgment.'" *Arneil v. Ramsey*, 550 F.2d 774, 782 (2d Cir. 1977) (quoting *American Pipe*, 414 U.S. at 554), overruled on other grounds by *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983) . . . .

*In re Eaton Corp. Secs. Litig.*, 2017 WL 4217146, at *6.

The reason why *American Pipe* tolling does not apply to persons who were not members of any class pleaded in a first-filed lawsuit was explained by the Second Circuit in *In re WorldCom Securities Litigation*: "for statute of limitations purposes, '[t]he theoretical basis on which *American Pipe* rests is the notion that class members are treated as parties to the class action.'" *In re Eaton Corp. Secs. Litig.*, 16-cv-5894, 2017 WL 4217146, at *6 (S.D.N.Y. Sep. 20, 2017) (quoting *In re WorldCom Secs. Litig.*, 496 F.3d at 255). It stands to reason that if no class is named or defined in a first-filed lawsuit – if that lawsuit is brought only on behalf of its named plaintiff and no one else – no absent class members can be treated as having been parties to that lawsuit from the beginning.

That is exactly what happened here. The original complaint in this lawsuit was filed by Mou – not by Mou and Hanson – and it was filed only on behalf of Mou, not on behalf of absent persons who were similarly situated. It was not until the Amended Complaint was filed that (1) Hanson was added as a named plaintiff and (2) the case was converted from an individual

lawsuit to an action brought on behalf of a putative class. Those changes were made on May 20, 2026.

So, as far as Hanson and the absent class members are concerned, May 20, 2026, is the date when the statute of limitations was tolled.

And the question then becomes – can we tell from the face of the complaint that, on May 20, 2026, Hanson's claims were time barred?

The answer is plainly yes.

Because the complaint does not plead any facts tending to show that Hanson made any inquiry about his lost funds, the test for statute of limitations purpose is when "the circumstances known to a plaintiff, as alleged in the complaint were such as to suggest to a person of ordinary intelligence that she has been defrauded. It is on that date that the duty of inquiry arose and the CEA's two-year limitations period commenced." *Levy*, 917 F.3d at 109 (quoting *Benfield v. Mocatta Metals Corp.*, 26 F.3d 19, 22 (2d Cir. 1994)). Once a plaintiff is on inquiry notice, if he makes no inquiry, then knowledge of his injury is imputed at the time the duty arose; the date when inquiry would have yielded actual knowledge becomes irrelevant.

The Amended Complaint pleads that BKEX imposed the "temporary" freeze on May 29, 2023. Ji argues, not unpersuasively, that this was enough to put BKEX's customers on notice of the fraud. He points to *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 474 (S.D.N.Y. 2016), to argue that the duty of inquiry attached at the time of the withdrawal freeze.

In *Shak*, the plaintiffs were forced to liquidate their positions on the silver commodity market due to alleged manipulation of silver futures by JP Morgan. *Id.* at 470. The *Shak* plaintiffs brought their complaint under the CEA four years after they liquidated their positions. Plaintiffs did not allege facts concerning any inquiry that they subsequently undertook, *id.* at 474–75, so

my colleague, Judge Engelmayer, confronted with a motion to dismiss the CEA claim, considered that the "duty of inquiry [arose] when 'circumstances would have suggested to a person of ordinary intelligence the probability that he had been defrauded.'" *Id.* at 473–74 (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 697 (S.D.N.Y. 2013), *vacated on other grounds sub. nom., Gelbolm v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016)). He determined that the duty of inquiry attached at the time the plaintiffs liquidated their positions in 2011, because that is when the plaintiffs suffered their loss and the allegations of the complaint suggested that they were contemporaneously aware of JP Morgan's role in their injury. *Id.* at 474.[3]

Here, the Amended Complaint alleges that BKEX froze the accounts in May 2023, and that Ji was aware of and approved that action. As was the case in *Shak*, Hanson was contemporaneously aware at least of the corporation's role in depriving him of his funds – making Ji's argument that the duty of inquiry arose when the accounts were frozen at the very least plausible.

However, even if no duty of inquiry arose immediately upon the freezing of the accounts, that duty was not suspended forever – or for an unreasonably long time. Assuming arguendo that the freeze itself was not enough to place Hanson on inquiry notice that something was amiss with his BKEX account, the continued lack of access to his account as the months rolled by should have told a person of ordinary intelligence that there might well be a problem worth looking into. However long that "reasonable" period might be – one month (as was the case with Mou), three months, even six month – we know, from the allegations of the complaint, that a person of

---

[3] The Second Circuit reversed Judge Engelmayer's dismissal of certain antitrust claims in *Shak*, but it did not reinstate the CEA claims; indeed, it does not appear that anyone contested the dismissal of those claims on limitations grounds. *See., e.g., Wacker v. JP Morgan Chase & Co.*, 678 F. App'x 27, 28–29 (2d Cir. 2017).

ordinary intelligence would have known that something was not right with his account well before May 19, 2024 – the date that is two years before Hanson's class action complaint was filed. We know this because at least one person of ordinary intelligence – Mou – had been making his own inquiries for some eleven months prior to May 19, 2024! If Mou could figure out that something was going on and make inquiries, so too could Hanson.

Therefore, Hanson's duty of inquiry was triggered more than two years prior to May 20, 2026, the date on which the class action complaint was filed. Which means that the complaint was untimely.

IV. Supplemental Jurisdiction

Plaintiffs allege in Claims III, IV, and VI that Defendants Ji and BKEX committed fraud, conversion, and were unjustly enriched through their actions in the fraudulent routing scheme, including transferring customer assets out of Plaintiffs' account and "rout[ing] them into an undisclosed third-party exchange infrastructure without authorization, while continuing to represent that the assets remained" in customer accounts. Dkt. 30, ¶ 402. The Court dismisses these claims for lack of supplemental subject-matter jurisdiction.

For a federal court to exercise jurisdiction over a state common law claim, the claim must either be brought under diversity jurisdiction or supplemental jurisdiction. Supplemental jurisdiction arises where "the federal and state claims derive from a common nucleus of operative fact." *Sullivan v. UBS AG*, 149 F.4th 206, 225 (2d Cir. 2025); *see* 28 U.S.C. § 1367. "In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well. Dismissal of the pendent state law claims is not, however, "absolutely mandatory" even where the federal claims have been dismissed before trial . . . ." *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) (quoting *Baylis v. Marriot Corp.*, 843 F.2d 658, 665 (2d Cir. 1988)).

> Once a court has dismissed all federal claims, it must decide whether the traditional values of "economy, convenience, fairness, and comity" counsel against the exercise of supplemental jurisdiction. *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 85 (2d Cir. 2018) (citation omitted). "In weighing these factors, the district court is aided by the Supreme Court's additional guidance in *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343 (1988), that in the usual case in which all federal law claims are eliminated before trial, the balance of factors will point toward declining to exercise jurisdiction over the remaining state-law claims." *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006). Likewise, it "is well settled that where . . . the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims." *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 325 (2d Cir. 2021) (citation omitted).

*Kataman Metals, LLC v. Macquarie Futures USA, LLC*, 22-cv-5272, 2023 WL 2775769, at *4 (S.D.N.Y. Apr. 4, 2023) (citation modified). Although the plaintiffs do argue that the court should exercise supplemental jurisdiction, it is because the claims arise from the same case and controversy as the federal law claims. Dkt. 51, at 16. Thus, without the federal law claims, the outcome should be the same as that in *Kataman*: "There is no reason in this case to depart from the ordinary practice of dismissing the remaining state law claims. The sole federal claim has been resolved, and the case in its early stages. Judicial economy and comity weigh in favor of the dismissal." *Kataman Metals*, 2023 WL 2775769, at *5.

## Conclusion

For the foregoing reasons, Defendant Ji's motion to dismiss for lack of personal jurisdiction is GRANTED.

In the alternative, Defendant Ji's motion to dismiss for failure to state a claim due to impermissible extraterritoriality is GRANTED as to Plaintiff Mou and DENIED as to Plaintiff Hanson. Defendant Ji's motion to dismiss the claims as barred by the statute of limitations is GRANTED as to Plaintiff Hanson and DENIED AS MOOT as to Plaintiff Mou.

Finally, Defendant Ji's motion to dismiss the common law claims for lack of supplemental jurisdiction is GRANTED.

The Clerk of Court is directed to remove the motion at Docket Number 46 from the Court's list of open motions.

This is a written opinion resolving a motion to dismiss.

Dated: November 19, 2026

U.S.D.J.

BY ECF TO ALL COUNSEL